BISWELL v. GLADNEY et al.    (No. 900.)*

(Court of Civil Appeals of Texas. Amarillo. Jan. 26, 1916. Rehearing Denied Feb. 16, 1916.)

1. VENDOR AND PURCHASER ⬙265 — RIGHTS OF PARTIES—NOTICE.

The purchaser of vendor's lien notes without actual notice of a conveyance by the purchaser was not charged with any fact upon which, on the doctrine of inquiry, notice of such deed could be imputed to him.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 492, 700–712; Dec. Dig. ⬙265.]

2. VENDOR AND PURCHASER ⬙281 — BONA FIDE PURCHASER—PAYMENT.

In a suit by the assignee of a vendor's lien note against the purchaser and a purchaser from him, evidence *held* not to establish the defense of payment as against the assignee's position of bona fide purchaser.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 792–794; Dec. Dig. ⬙281.]

3. VENDOR AND PURCHASER ⬙281 — LIEN NOTES—HOLDER IN GOOD FAITH—BURDEN OF PROOF.

The possession of a vendor's lien note, together with its indorsement by the vendor "without recourse," put the burden of proof upon the purchaser and his grantee to show that the assignee was not an innocent transferee of the note.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 792–794; Dec. Dig. ⬙281.]

4. MARSHALING ASSETS AND SECURITIES ⬙5 —RIGHTS OF PURCHASERS OF PART OF TRACT OF LAND.

In marshaling securities in favor of a prior grantee, the rule is that where, from the character of his conveyance, it is inequitable that his land should primarily bear the burden of the common charge, either in whole or in part, equity will presume an intention of the parties that the part conveyed should be free from such burden until the grantor's land is first exhausted, and the grantee has the superior equity.

[Ed. Note.—For other cases, see Marshaling Assets and Securities, Cent. Dig. § 10; Dec. Dig. ⬙5.]

5. MORTGAGES ⬙287—SALE BY MORTGAGOR— QUITCLAIM DEED—EQUITIES.

Where one purchases part of a mortgagor's land by quitclaim deed and pays an agreed valuable consideration, without the mortgage debt in any way becoming a part thereof, the presumed intention between the parties is that the grantor will pay his own debt, and equitably his land should be first condemned for that purpose; the rule not depending upon the existence or nonexistence of covenants of warranty.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 782, 783; Dec. Dig. ⬙287.]

6. VENDOR AND PURCHASER ⬙265—ASSIGN-MENT OF VENDOR'S LIEN NOTE — VENDOR'S SUBSEQUENT QUITCLAIM DEED—NOTICE.

The record of a quitclaim deed, not on its face showing that the grantor and grantee contracted in regard to the grantor's debt for purchase money of a larger tract, as a part of the real consideration, affords notice of the equities to a subsequent assignee of the vendor's lien notes, as a vendor with notice of his purchaser's subsequent deed is not bound to impart his knowledge to his assignee, or to notify his grantee that he has sold the lien notes, so that the grantee can notify the assignee.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 492, 700–712; Dec. Dig. ⬙265.]

7. VENDOR AND PURCHASER ⬙231—EQUITIES —NOTICE—SUBSEQUENT DEED.

A subsequent deed of record does not afford constructive notice to an anterior holder of an interest in the land, since record notice goes forward, and not backward.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ⬙231.]

8. VENDOR AND PURCHASER ⬙231 — BONA FIDE PURCHASER—NOTICE.

A subsequent purchaser of part of land affected with a common charge has constructive notice of the equities of a prior grantee, who has bought another part of the same land and placed his deed on record.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ⬙231.]

9. VENDOR AND PURCHASER ⬙265 — BONA FIDE PURCHASER—SEARCH.

A subsequent purchaser of land subject to a vendor's lien is not required to go further than the record in searching the vendor's lien note, if he does not know it has been assigned.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 492, 700–712; Dec. Dig. ⬙265.]

10. VENDOR AND PURCHASER ⬙261 — VEN-DOR'S LIEN—ASSIGNMENT—REGISTRATION.

The assignment of a vendor's lien is within the registration statutes.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 674–686, 688–695; Dec. Dig. ⬙261.]

11. VENDOR AND PURCHASER ⬙265—LIEN— RELEASE—EFFECT.

B. conveyed land to G., retaining an express vendor's lien. G. thereafter quitclaimed to M. a part of the land for a consideration which was paid by M.'s conveyance of other land to G.; the parties to the deed agreeing between themselves that the land conveyed should be discharged from the vendor's lien. The quitclaim deed was upon record before W. acquired the vendor's lien notes. B., together with C., a prior assignee of the notes, with notice of the conveyance and before W. acquired the notes, released another part of the land exceeding in value the notes held by W. *Held* that the land conveyed to M. was discharged, and such dis-

charge inured to M.'s grantee under a general warranty deed.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 492, 700-712; Dec. Dig. ☞265.]

Appeal from District Court, Potter County; Hugh L. Umphres, Judge.

Action by W. H. Biswell against R. L. Gladney and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Ben H. Stone, of Amarillo, for appellant. Jas. N. Browning and Kimbrough, Underwood & Jackson, all of Amarillo, for appellees.

HENDRICKS, J. On May 19, 1905, Charles Brinkman conveyed to Gladney a section of land situated in Potter county, Tex., upon the cash consideration of $1,000 and a deferred consideration of four vendor's lien notes; the first two for $1,000 each, and the last two for the sum of $740 each, being negotiable in form and recognizing the vendor's lien, which was also expressly retained in the deed. On the 9th day of October, 1905, Gladney executed a quitclaim deed to Will A. Miller, Jr., to 157.47 acres of said land, which was recorded November 22, 1905. The land was school land, and it was agreed between Gladney and Miller, in the trade producing the conveyance above mentioned, that Miller's land should be relieved of the vendor's lien and that the land should be patented, Gladney to furnish the consideration for the patent, which, after the execution of said deed, was obtained in 1906.

The two $740 notes matured, on their face, respectively, the 1st day of January, 1907, and the 1st day of January, 1908. In 1907, probably the latter part of May of that year, W. H. Biswell, the plaintiff in this suit, acquired the possession of the two $740 notes, thereafter transferring the same to one Cooper. When Cooper was in possession of the notes, he executed with Brinkman a release of a part of the land, which, it is agreed, was of the value of $2,400 at the time of the release. At the time Biswell received the notes they were in the possession of the First National Bank of Amarillo, as collateral security for the payment of indebtedness evidenced by Brinkman's note to the bank, and which provided for the sale of collateral.

[1] When Biswell received the notes there was no transfer in writing from Brinkman, or the bank, assigning the lien. Biswell had no actual notice at that time of the conveyance from Gladney to Miller, executed in October, 1905; nor does this record charge him with any fact by which, on the doctrine of inquiry, notice of said deed could be imputed to him. The only notice of which he could be charged is constructive notice by the record, which will be discussed later. Biswell reacquired the two notes from Cooper, and we find from his testimony that he knew of the execution of the Cooper-Brinkman release of the debt remaining to another por-

tion of the land than Miller's, of the value as stated, ⁓before he reacquired said notes. The note in suit was indorsed upon the back with Brinkman's signature, with a further indorsement, "Without recourse," immediately preceding his name. Biswell asserts that he is an innocent purchaser of the note in suit in due course of trade, paying full value therefor, without any knowledge of the Gladney-Miller deed, executed in October, 1905.

In the trial court it was litigated as a jury question whether Biswell, when he acquired the possession of the note, was a transferee or assignee of the same, or whether the money furnished him was used for the purpose of paying said note, thereby operating as an extinguishment of same. The jury found upon special issues that the note sued upon was "paid" while owned by the payee and before plaintiff acquired the same, and further responded that Biswell, the plaintiff, paid the note. Judgment was rendered against Gladney for the debt evidenced by the note, but plaintiff was denied a foreclosure of the lien against any of the defendants.

[2, 3] Plaintiff asserts that the testimony was insufficient to permit the submission of the issue that the note was paid, and not assigned, and considered from the angle that the indorsement upon the back of the negotiable note, with the possession in Biswell, placing the burden of proof upon defendants to show that he was not an innocent transferee of the note, we would reverse and remand this case upon plaintiff's exceptions, that the testimony was insufficient to show that the note was paid as against his claim of innocent purchase, if we were not of the opinion that the judgment should be affirmed upon another ground.

Appellees say that Brinkman gave the bank no authority to sell the note, and that the president of the bank testified that it was not customary to sell securities to a collateral note unless with the consent of the owner. The president could not recall the transaction, if it occurred, but said, however:

"That sometimes, when we don't think the party that owes us would object, and that it would be agreeable if we would get all of his money and stop the interest, that (meaning the sale of the note) would be all right."

Appellee asserts that Gladney paid the note and sold it to Biswell, or, further, as we inferred from the argument, that he received the funds from Biswell and paid the note at the bank, and then forwarded it to Biswell, and that in either event, as between Gladney and the bank, it was a payment, and not a transfer. It is noted that the jury found that Biswell paid the note, which means that he furnished the money, notwithstanding it was found that he paid the note. Brinkman said that he merely placed the notes in the bank for collection. The particular note had not matured. "Payment can only be made before ma-

turity by consent of both debtor and creditor." Daniel, Neg. Inst. vol. 2, § 1233. Of course, it is really true that a sale of a note is a contract requiring the meeting of minds, the same as any other agreement.

It is asserted that Brinkman's testimony that he only placed the note in the bank for cancellation, in connection with the testimony of the president of the bank as to the custom of the bank in matters of that kind, precludes the idea of a sale. There is no fact in the statement of facts connecting Gladney with the payment of the note at the bank. Brinkman never testified that he authorized the payment of the note before maturity. The fact that Gladney requested or wrote to Biswell to carry the notes for him does not justify the inference that Biswell sent the money to him, or that Gladney took his own money to the bank, paid the note before maturity, and then sold the same to Biswell. Who put the indorsement, "Without recourse," on the back of the note, is not shown. Brinkman said he did not do it; a great many of the letters of Gladney were attached to Biswell's deposition; we assume the letters were not introduced; neither do we find any attempt to prove that Gladney wrote the indorsement. Gladney was not believed by the jury in regard to a part of the transaction with Miller; but we find nothing to "build to" in the record that Gladney or Biswell paid the notes at the bank, except that Brinkman said he placed the notes in the bank merely for collection, and the testimony of the bank president that it was not customary, without the owner's consent, to sell the collateral, and at that time such a matter would probably have been referred to him, and the further fact that Gladney requested Biswell to carry the note. This transaction was eight years old, and whatever occurred, and whether the note was paid or sold, the president of the bank had no recollection whatever of any such transaction, and the president's testimony necessarily was opinionative.

There seems to be no question but what the form of collateral note gave the power to sell the paper. He did say that "sometimes," where they thought it would be agreeable to the owner, for the purpose of getting all of his money and stopping the interest, they would sell the paper. If Biswell furnished the money, the question left is how he furnished it. The bank had more power, according to this record, to sell the note than to receive payment before maturity. The president said:

"When a note is placed in my bank for collection, and when it is paid before maturity, my bank ordinarily stamps 'Paid' on such note, * * * unless there was a request to the contrary."

This note was not stamped "Paid." Biswell testified that to the best of his recollection he purchased the note through one of the banks at Amarillo during the first half of 1907, and did so at the request of Gladney; that he trusted the matter to the bank, and sent the funds, and the bank procured the note and mailed it to him. His recollection was that Gladney requested him to send the money and instructions to the First National Bank, and that he was not sure whether the Amarillo National, where he had an account, or the First National, forwarded the notes.

Without detailing further facts and inferences, applicable to the jury's finding that the note was paid, we would reverse this case upon appellant's assignment questioning the sufficiency of the facts to submit the defense of payment as against his position of bona fide purchase, but conclude that it should be affirmed upon another ground. We find the facts on this issue for appellant's benefit, referable to future proceedings to the Supreme Court, without, of course, anticipating any future action on our part.

Relative to the proposition upon which we affirmed the judgment of the trial court, the record is in this condition: Brinkman conveyed to Gladney, retaining an express vendor's lien for the deferred consideration. Gladney thereafter, by quitclaim, transferred whatever interest he had to Miller, reciting a consideration of $2,200, in payment of the land. This consideration was paid by the conveyance of other land to Gladney. This deed was upon the record before Biswell acquired the notes. Brinkman had notice of the sale to Miller before Biswell acquired the notes. Cooper, with Brinkman, relinquished 160 acres to Gladney, out of the mortgage (different land from that conveyed to Miller), of which Biswell had notice, and the land released to Gladney exceeded in value the debt when released. All the land, except Miller's, was released from the lien, but we shall argue the case referable to the one release mentioned, of which Biswell had actual notice.

The appellant and appellee tender a controversy over the doctrine of inverse order of alienation; the appellant contending that it does not apply to this record for two reasons: First, Cooper or Biswell must have had actual notice of the conveyance from Gladney to Miller; and, second, Miller, acquiring his interest by a quitclaim deed, is not in a position to invoke the equitable principle. The last proposition will be discussed first.

Strictly speaking, inverse order of alienation is not applicable to this record, though argumentatively involved. There is no proof that there were any other purchasers of this land from Gladney except Miller. Plaintiff did allege that all the land except the 157 acres had been previously released and that it was done for the benefit of the "then" owners of the land; still this record presents the question merely of the equality or inequality of the equities between Miller and Gladney, and whether or not the assignee of the vendor's lien had sufficient notice of the

same, and, if superior, in favor of Miller, whether the release by Cooper and Brinkman disturbs such equities, thereby releasing the land to Miller. It will be conceded, we assume, that, if the equities of Miller are superior to the equities of Gladney, who, so far as this record shows, was the owner of the balance of the land when the releases were made, and if the mortgagee or his assignee is chargeable with notice of such equities, the release of Gladney's land, being in value more than the amount of the debt, would release Miller's land. Where the owner of a parcel of land, who has previously executed a mortgage upon the same, sells one parcel to another and retains a part, where the contract between the parties is such, with the aid of equity, that it can be presumed that the part retained should first bear the burden, preferable to the land of his vendee, the mortgagee, with notice of these equities, disturbs them at his peril. In case of successive purchasers, with the owner the latter retaining a part, where neither has the right that the other's portion should be primarily subjected to the mortgage debt, the equities between all the parties are then equal; and if a purchaser redeems the mortgage, the others are entitled to a pro rata contribution, and a pro rata subjection of the land to the payment of said debt. Beck v. Tarrant, 61 Tex. 405, 406. This latter fundamental rule, as between different portions of the premises subject to a common charge, assists in the birth of the maxim that "equality is equity," and, where applied, ratable contribution always follows. Same case.

Where the mortgagee sues the owner and successive purchasers from him to foreclose his mortgage, and one defendant has a prior equity over another defendant as to the land liable primarily, if no release is made by the mortgagee to the land primarily liable, he is not interested, whether he had notice, or not, of the equities between them. If he has done no act to prejudice the right of the holder of the superior equity, his mouth is closed as to the enforcement of the equity and the sale of the land in accordance therewith, unless the foreclosure sale of the land in parcels would prejudice his debt and prior rights, where his mortgage is a blanket one on the land as an entire tract; and in that character of case first stated the equities are unequal; one has a superior equity.

[4] In marshaling securities in favor of a prior grantee, it is true you may not base it on the simple fact of the earliest grant; however, the rule is, and properly, deducible from equitable principles, that where, from the character of the first conveyance, it is inequitable that the grantee's land should primarily bear the burden of the common charge, either in whole or in part, equity will then presume the intention of the parties to the conveyance that the portion conveyed should be free from the common burden, until the grantor's land is first exhausted; the grantee has the superior equity.

For the moment eliminating the matters of the Cooper-Brinkman release to Gladney's land, we will present the condition as follows: If Gladney owned all but 157 acres of the land, and the holder of the vendor's lien notes had sued both Gladney and Miller, instead of Miller, for the purpose of foreclosure on both tracts, and the issues were presented, which land, under considerations of equity, should be first subjected? This condition may assist some in the solution of the case. If the equities between the parties were equal, the burdens would be equal; but, if superior in favor of Miller, Gladney's land should be sold first. If they are equal, the whole land would be subjected as a whole; if Gladney's were superior, making the equities unequal in his favor, Miller's land should be sold first. The inequality of the equity would destroy the equity of burden. Appellant has Pomeroy in his favor. He says:

"The doctrine * * * is one of purely equitable origin, and is not an absolute rule of law, and if the peculiar equitable reasons on which it rests are wanting, it ceases to operate. Whether it does or does not apply to any particular case may be sufficiently determined by a careful consideration of the following principles: The doctrine, in its full scope and operation, primarily depends upon the relation subsisting between the mortgagor or other owner of the entire mortgaged premises and his grantee of a parcel of land. This relation, in turn, results from the form of the conveyance, which, being a warranty deed, or equivalent to a warranty, shows *conclusively* an intention between the two that the grantor is to assume the whole burden of the incumbrance as a charge upon his own parcel, while the grantee is to take and hold his portion entirely free." Section 1225, vol. 3, Equity Jurisprudence.

We assume, of course, that a warranty deed, or a deed equivalent to a warranty, would show *conclusively* an intention that the grantor is to bear the whole burden as a charge upon his own land. He further says:

"When the deeds to the successive grantees are not warranty, or equivalent thereto, but simply purport to convey the mortgagor's right, title, and interest in the parcels, the intention is clear that the grantees respectively assume their portion of the burdens. Their several parcels *are all liable ratably, and not in the inverse order.*" Same section, supra. (Underscoring is ours.)

[5] Pomeroy is speaking more particularly probably of the subjection of land against grantees in the inverse order of their alienation, when he refers to the character of the instruments conveying the mortgagor's interest. If it is meant, however, by this language that the interest of one who purchases a part by quitclaim deed and pays a valuable consideration for the interest purchased as agreed upon between the parties, without the mortgage debt in any manner becoming a part of the consideration, and without anything showing that the grantee and grantor intended that the land of the grantee should be so charged, we think that

the presumed intention between the parties is that the grantor will pay his own debt, and equitably his land should be first condemned for that purpose, and that his grantee should not be compelled to pay it out of his land as between the immediate parties. The cases under note 4 and note "e," under section 1225, vol. 3, Pomeroy, Eq. Jurisp., cited by the great jurist, in so far as they are accessible to us, do not support the doctrine. We are unable to obtain 2 Leading Cases in Equity (4th Am. Ed.) p. 304, and Aiken v. Gale, 37 N. H. 501. Erlinger v. Boul, 7 Ill. App. 40, is the nearest case on the facts supporting the doctrine accessible to us, and in that case the purchaser bought the land at execution sale.

The Supreme Court of Michigan, in the case of Cooper v. Bigly, 13 Mich. 474, at a time when Justices Campbell and Cooley were members of that court, said that:

The doctrine "rests chiefly, perhaps, upon the grounds that, where one who is bound to pay a mortgage confers upon others rights in any portion of the property, retaining other portions himself, it is unjust that they should be deprived of their rights, so long as he has property covered by the mortgage out of which the debt can be made. In other words, his debts should be paid out of his own estate, instead of being charged on the estates of his grantees. Any other rule would be, in effect, to enable him to enjoy for his own benefit that which he has once vested in another, and in a measure to recall his own grant. The rule cannot, therefore, depend upon the existence or nonexistence of covenants of warranty. It depends simply on the fact whether he has or has not seen fit, in making a disposition of a part of his incumbered premises, to charge it primarily with the payment of the incumbrance. * * * It has, indeed, in several cases cited at the bar, been held that the covenant of warranty was very important, in determining the intent of the mortgagor not to charge the mortgage on the property sold. *But there is no satisfactory authority holding that, in the absence of such a warranty, no such intent could be presumed.* On the contrary, wherever the doctrine of priority is respected at all, it has been enforced unless an opposite intent was made out. And such appears to us the common-sense inference; for a man owing a debt, for which his own property remains liable, must naturally be supposed to expect to have it paid out of his own means, unless he has bargained to the contrary. And this equity, having arisen in favor of the first purchaser, must remain in his favor against any subsequent equities of other parties derived from his grantor."

We are unable to find a case deciding, where the point was involved, that the equity could not be founded upon a quitclaim deed; and in combing the authorities, according to the best investigation we are able to make, neither can we find a case which affirmatively decides that the rule depends upon the existence or nonexistence of covenants of warranty. We find cases abundant deciding, where the owner of land conveys by deed "with covenants of warranty," the part retained by him is charged primarily. The intention is then conclusive as Pomeroy states; but the genesis of the rule should be an answer to the question—like other equitable rules—what are the equities derivable

from the relation of the parties? We find, wherever the mortgage debt enters into the contract of conveyance between the parties, generally one way or the other, the equities become unequal in favor of one or the other. If the mortgage debt is deducted from the consideration, the grantor's land is not primarily charged with the burden. If the grantee assumes the debt, of course, his land is charged with the burden. If the conveyance uses language "subject to the mortgage," some of the courts construe that the grantee's land is also charged, because the intention is manifested by the use of such language, or expressions equivalent thereto, that it is intended that his land will be first subjected thereto. In other words, if the mortgage debt enters into the deed in some manner, affecting the consideration, different rules of burden and contribution result; but if a man sells his land, or all of his interest in same, it being the same land and the same interest he has previously mortgaged, but the previous mortgage debt does not enter into or become a part, contractually speaking, of the trade between the parties, and the vendor receives his agreed consideration for the land or his interest, we are unable to see why he should not be compelled first to pay his own debt out of his own land, and think that, as between him and his grantee, the latter should not be compelled to again pay for the land in whole or in part, or more than the value agreed upon between the parties. We are unable to say, neither does the law justify, upon careful consideration, as a matter of evidence, that a man pays less for a quitclaim deed than for any other deed—that fact alone considered.

Hence, back to the case put, where the mortgagee sues the owner and his grantee under the conditions mentioned, the latter holding under a quitclaim, to hold that the equities are equal as between the mortgagor and his grantee is to hold that the grantee in equity should be compelled to pay more than he originally agreed to pay to the owner of the land for his parcel, and is required to pay in whole or in part his grantor's debt, for which the latter is alone responsible. If such were equity, an owner of 100 acres, who sold nine different 10-acre tracts to different grantees, by quitclaim deeds, receiving $1,000 for each tract, and retained 10 acres, when sued by a mortgagee upon a $5,000 mortgage, with the other owners, and the mortgagor's tract retained by him were the least valuable, the mortgagor would, by the doctrine of equal equities, if the whole land brought the debt, practically have his debt paid and receive $9,000 for the land; and upon the doctrine that his equity was superior, and the grantee's land should be first subjected, others would pay the debt for which he alone is responsible. This would not be equity. It would be injustice.

It may be that, if a mortgagor were to

pay the debt before suit, the same would be extinguished, and in that event he would not be able to proceed against the other grantees. Washburn on Real Property, vol. 2, c. 16, § 8, subsec. 4. But if one of these successive grantees were to agree to pay off the whole mortgage, and the mortgagor, on account of the default of his obligor, would then be required to pay it, and thereby raise an equitable assignment to him of the mortgage, such an owner of the land and assignee of the mortgage, in proceeding against the whole land for subjection to the mortgage, would be in a splendid position, selfishly, if his obligor were insolvent, to add to his assets. Eight of them have paid for their land. If the equities were even equal, requiring a ratable contribution, the mortgagor and owner of the remaining tract, who had become the equitable assignee, would have sold $8,000 worth of land, and have the right to proceed upon his own debt against his own grantees, who had not assumed it, absorbing their land for the payment thereof. If the mortgagor's equity were superior, his land would not be subjected; he would pay nothing, have his own debt paid, keep his own land, and receive $8,000. Indirectly, he would make his grantees pay his own debt and also recall his own grant. Neither do we think this would be equity. Equities are equal where there is equality. This would be inequality of the grossest nature.

There are cases, where a part of a greater tract is sold under execution and the whole is subject to a blanket mortgage, holding that the purchaser at sheriff's sale has no superior equities; the holding, it is true, is rather placed upon the ground that the purchaser at sheriff's sale bought only the equity of redemption. It is apparent, however, that a substantial distinction exists between such a purchaser and one under voluntary sale directly from the owner, where he pays the agreed consideration. It is also true in this state that an owner, who sells a part of his tract by quitclaim deed, merely conveys the equity of redemption and the title he then owned; but that should not be a criterion creating the equality or inequality of the equities between the parties. The owner has sold all that he possessed, and the purchaser pays that which the owner demands. At sheriff's sale the law condemns and sells the land, and the owner is the beneficiary only to the extent of the money paid by the higher bidder. When the owner sells with a warranty, the purchaser has made it conclusive that his land should not be incumbered with the whole burden of the debt as between him and the mortgagor; but we see no equitable reason, as between a grantee under a quitclaim and his vendor, when the outstanding mortgage does not enter into the consideration in the face of the deed, and he receives from the grantee what he demands for the land, that such grantee's land should be primarily charged with the burden of the debt, or equally charged with the grantor with an equal burden. The consequences derivable result in injustice. When a grantor receives his price for the land, he should not be paid again indirectly, through the medium of a mortgage foreclosure by a cancellation in whole or in part of his own indebtedness with his grantee's land, and resulting in a benefit to him, more than the consideration for which he has sold his interest in the land. There is no necessity of becoming confused with the rights of holders of unrecorded deeds, or equitable or legal outstanding titles, from a common source, not passing by a quitclaim deed, and the grantee not being an innocent purchaser of such title under such deed.

Under the law of this state a holder under a general warranty, or a deed conveying the land, unless he has notice, is of course in a better position than the other. But because such deeds are of more strength for such purposes, and may be stronger evidence for the purpose of proving more conclusively the equities of the grantee, is no sound reason against the equity. But, though a covenant of warranty runs with the land, even to the extent of passing to a holder of a quitclaim, however, as to the indemnity feature between the parties, it is, at last, only a personal covenant; and when an owner conveys a part of his land, with covenants of general warranty, and retains a part, the mortgagee does not become a party to the covenant, and has the right of lien just the same, except that he must not disturb the equities, if he knows, and providing it is not prejudicial to his debt to enforce the equity. The owner, legally speaking, does not contract with his grantee, even under a warranty deed, that the land retained by him shall bear the whole burden. Equity permits the grantee to place the burden primarily upon his grantor's land, not because the contract of the grantor did so, for there is nothing in the warranty, or the deed, or in the contract, making the land retained bear such burden. Strictly speaking, there is no breach, nor does the grantee have to show a breach. Hawkins v. Potter, 130 S. W. 644, 645 (writ of error denied). It has been the history of equity to create rights where a contract does not really provide for them. The equitable vendor's lien is a notable example. The parties do not contract for a lien, but a court of equity says it is unjust for a grantee upon a deferred consideration, though the deed does not provide for the lien, and though the instrument may recite that the consideration has been paid, to keep the land freed from such a lien. Equity charges it upon the land on account of the relation between the parties because it is just.

Again, under appropriate conditions, where a prior mortgagee has two funds, and a junior mortgagee has only one, without the semblance of contractual relation between

the two lienholders, equity stays the hand of the prior mortgagee upon the latter fund until he has exhausted the other fund. Whenever by the evolution of juridical conscience an equitable rule is deducible from the relation of the parties, the province of equity, though sometimes slow in development, is to apply that rule.

It may be said that to permit such a rule would produce this result: The first purchaser gets his part of the land by quitclaim; a second purchaser might receive his parcel by a conveyance of warranty; and if you make the first grantee's equity superior to the grantor's, you would make his deed, in cases of inverse order of alienation, superior to the warranty deed. We do not think this should complicate the real equities between the first parties. It is a settled rule that, if the superior equity exists, a subsequent purchaser, though buying a different portion of the same tract, is charged with notice of the first deed and the equity created by the relation between that holder and the common grantor. The principle causing the subjection of land by the inverse order of alienation is based upon this condition: When, between the first grantee of a parcel out of a large tract the relation between these parties makes it equitable that the land retained by the grantor, covered by a previous mortgage, should bear the burden first, that burden is transmitted to succeeding purchasers, and the last is first, and first last, in the order of condemnation and sale. Hence, if you once establish logically the premise that it is truly equitable, between the grantor and his first grantee, that the land retained by the former should primarily bear the burden, such an equity is fixed, and the personal covenant in a subsequent deed should not necessarily destroy the prior equity produced by a quitclaim considered alone. Equity, if the rule of right really exists, has already burdened the land sold to the next purchaser.

Of course, as stated, the real question in this record is not strictly one of inverse order of alienation, but is one of equitable right between Gladney and Miller, and the assignee of Brinkman's lien, though, as a matter of logical result, the principle may be involved.

[6-11] As to the other mooted question: Does the record of a quitclaim, which does not upon its face show that the grantor and grantee contracted in regard to the mortgage debt as a part of the real consideration, afford notice to a subsequent assignee of such prior lien of the equities? It is true the authorities are unanimous that a prior mortgagee is not affected with notice by the record only of a subsequent deed, and the equities created thereby, against the mortgagor. The reason of the rule is simple and apparent: a subsequent deed of record does not afford constructive notice to an anterior holder of an interest in the land. The record notice goes forward, and not backward. The mortgagee does not have to be running to the record to ascertain if his lien has been subsequently affected.

It is also as thoroughly well settled that, if the prior mortgagee has actual notice of a subsequent deed, he is affected with the equities. It is likewise the unanimous rule that a subsequent purchaser of part of the land, though he is not purchasing the same land as a previous grantee, has, however, constructive notice of a prior grantee's equities who has bought a part of the same land covered by prior mortgage. It is the policy of the registration statutes to give constructive notice of such equities to subsequent purchasers.

Hence, take the actual case in this record: Brinkman, the original holder of the lien, has notice of Miller's deed before the assignment of his lien. If a purchaser of a part of the tract has afforded actual notice to a prior mortgagor, if thereafter the mortgage is assigned, is such grantee, who has a deed of record previous to the assignment, compelled to constantly inquire of the mortgagee if he has assigned his mortgage? A subsequent purchaser of the land is not required to go further than the record in hunting the note, if he does not know it has been assigned. Moran v. Wheeler, 87 Tex. 183, 27 S. W. 54. We know of no duty upon the mortgagee, who has thus been notified, to transfer his knowledge to his assignee; neither is the duty imposed upon him to notify such grantee that he has sold the mortgage, so that the latter can notify the assignee of the mortgage. If the assignment of the lien is in writing and placed of record, it is a subsequent record, not affording notice to a prior deed holder; either duty you would force upon the grantee, situated as Miller, is equally unreasonable and illogical. What should be the true rule? The assignment of a lien is within our registration statutes. Because a vendor's lien note is negotiable does not afford immunity to subsequent assignees, when the assignment is not of record, if the record embodies an instrument from the original holder of the lien, affecting the land, though subsequent to the mortgage, if made and placed of record, without knowledge of the assignment. Moran v. Wheeler, 87 Tex. 179, 27 S. W. 54; Drumm v. Core, 47 Tex. Civ. App. 216, 105 S. W. 843. The real holding of those cases, of course, is not just as stated, but clearly supports the proposition, and we are using them to enforce the position that parties buying liens, and interest in lands, should go to the record. Careful purchasers do. The record of a quitclaim deed affords notice within the scope of the instrument as much as any other deed. If, when purchasing, the subsequent assignee had gone to the record, he would have seen a deed conveying all the interest Gladney possessed to Miller, which is covered by the lien he is purchasing, and which deed on its

face does not purport to contract in regard to the lien debt as a part of the consideration, and which deed he cannot presume is a voluntary instrument. He must presume on the face of the record, though we are not holding that he is bound by the amount of the consideration stated in the deed, that Gladney has sold to Miller that which he possessed for a valuable consideration. The record supports the inference and negatives on its face, every other inference than the one stated. If our premise is correct, that a grantee of a mortgagor's interest, who has paid the consideration, where the instrument does not show that the mortgage debt has not so entered into the consideration as to change the equity—that such grantee, who has once paid the grantor, should not be compelled, primarily, to pay the grantor's personal debt with his land (it being the grantor's duty to pay his own debt), and if Miller's deed presumptively shows that he paid a valuable consideration for the grantor's interest in the land, the subsequent assignee of the mortgage should be charged with notice of the record of that deed, and the holder's equity created thereby, the same as the record of any other deed.

The value of the land released being more than the balance of the debt, we think Miller's land should be discharged, and of course the same right would inure to Muncie, his remote vendee under Miller's general warranty deed.

The judgment is affirmed.