**Judy MILLER, et al., Appellants,**

v.

**Robert J. SANDVICK, et al., Appellees.**

**No. 07–95–0118–CV.**

Court of Appeals of Texas, Amarillo.

April 30, 1996.

Rehearing Overruled May 29, 1996.

vick; JoAnn L. Smith; Rickey Lyon and wife, Bettina J. Lyon; J. Edward Johnson and wife, Colleen Johnson; Steve Pitts; Steve Holland and wife, Sherri Holland; John Glenn and wife, Mary Glenn; T.J. Clemmons, M.D., and wife, Cuylene Clemmons; Alfred Velasquez and wife, Jan J. Velasquez, who are collectively referred to as the homeowners.

The events underlying the litigation began when J.D. Badly, as owner of Section 35, Block A–K, Lubbock County, Texas, carved out Pine Grove Estates and, on 2 April 1979 imposed certain restrictive covenants, as evinced by an instrument recorded in volume 1638, page 7 of the Lubbock County deed records, upon the use, occupancy and construction of Lots 1 through 61 and Lots 71 through 106 (the covenants). As pertinent to the litigation, a part of the restrictions were that:

> (1) No building plot or site or part of said premises shall be used for business or commercial purposes, all lots, plots, sites and premises being restricted to single family residential purposes only....

> (2) No building or structure shall be erected, altered, placed or permitted to remain on any part of the property, except one single detached family dwelling and outbuildings used in connection therewith, on each building plot....

> (4) The following minimum construction requirements must also be complied with:

> \*   \*   \*   \*   \*   \*

> > (c) No residence, garage or servants quarters shall be built on any part of the property that has a roof of crushed stone, marble, gravel, or composition shingles. It is required that said roofs shall be built with wood shingles, clay tile, or other life-time materials....

The covenants were designed to run with the land until 2 April 2019; nevertheless, the following provision was included:

> These covenants may be amended at any time by an instrument signed by two-thirds (⅔) of the then owners of building sites or building plots, (each building site or building plot to have one vote) and such

Crenshaw, Dupree & Milam, L.L.P., Cecil Kuhne and Jack McCutchin, Jr., Lubbock, for appellants.

Carr Fouts Hunt & Wolfe L.L.P., Donald M. Hunt and Gary M. Bellair, Lubbock, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

This appeal tests the efficacy of a summary judgment declaring effective the restrictive covenants impressed upon residential lots in the Pine Grove Estates in Lubbock, and pronouncing void and of no effect an instrument purporting to cancel the restrictions as to some of the lots. We will affirm.

The appeal is brought by Judy Miller a/k/a Judy R. Miller f/k/a Judy Proctor and Anthony Romond Miller a/k/a A.R. Miller, two of the parties who attempted to cancel the restrictions. The homeowners opposing the attempted cancellation and securing the judgment validating the covenants are Robert J. Sandvick and wife, Shirley A. Sand-

instrument is recorded in the office of the County Clerk of Lubbock County, Texas. This language is referred to as the amendment provision.

Purporting to invoke the amendment provision, Dewayne Proctor and his then wife Judy Proctor, Judy's sister Carolyn Jane Sanderson and her husband Bob Sanderson, who collectively owned 71 of the 96 lots in Pine Grove Estates, and exclusively owned Lots 51, 61, 71, 72, 73, and 74, filed on 8 October 1986, in volume 2331, page 278 deed records of Lubbock County, an instrument entitled "Cancellation of Restrictions Lots 51, 61, 71, 72, 73 and 74" (the cancellation instrument). The cancellation instrument professed to "release, relinquish, cancel, terminate and hold for naught all of . . . [the covenants] . . . so that the same shall hereafter be of no further force or effect," as they pertained to the six lots described. None of the homeowners was given an opportunity to vote on the cancellation, nor were they notified of the filing of the cancellation instrument.

Judy Proctor's marriage to Dewayne Proctor dissolved and she married Anthony Romond Miller, but retained her ownership of Lot 51 in Pine Grove Estates. In February of 1992, the Millers began construction of a building on Lot 51.

The homeowners averred that on 1 June 1992, they realized the Millers were building a duplex, and had placed upon it a composition roof, in direct violation of the covenants. On 6 June, 1992, they met with the Millers and Sandersons and requested the building be brought into compliance. Relying upon the effect of cancellation instrument, the Millers refused.

Discord between the homeowners and the Millers and the Sandersons resulted in legal filings, and negotiations ensued. The end result of those negotiations was an agreement which provided, among other things, that to compromise the claims of all the parties, the Sandersons and the Millers would execute and file of record a ratification and reaffirmation of the covenants, and the Millers would convert the duplex to a single family residence with a wood-shingle or other life-time material roof placed thereon.

The ratification agreement was signed by the Sandersons and 60 others of the 74 listed lot owners who claimed some ownership interest in the 96 lots of Pine Grove Estates. However, the Millers did not sign the agreement and have not complied with its terms. Alleging the duplex violated the covenants, the homeowners brought the underlying suit, seeking enforcement of the covenants by temporary and permanent injunction, and recovery of damages for the Millers' breach of the covenants together with attorney's fees for the necessity of enforcement.

The Millers answered with a general denial and alleged affirmative defenses. The Millers maintained that the cancellation instrument was valid, and the homeowners had no authority to interfere with their right to build a duplex on Lot 51. Further, the homeowners had constructive knowledge of the cancellation instrument prior to the construction of the duplex and did nothing about it until after its completion; thus, they waived or were estopped from asserting the right to complain, and the doctrine of laches prevented any action by the homeowners. The Millers denied any right of the homeowners to an injunction because no bond was filed, and denied their right to attorney's fees because the action was not one for enforcement of restrictions, but to set aside the cancellation instrument.

The homeowners moved for summary judgment. They alleged that Lot 51 was subject to the covenants, and the duplex was in violation thereof. They sought a permanent injunction against (1) the Millers erecting any structure other than a single family dwelling on Lot 51, and (2) permitting the duplex to remain in noncompliance. Their supporting affidavits averred that the four signatures on the cancellation instrument did not constitute two-thirds of the then owners in Pine Grove Estates. They also asserted that they had no opportunity to vote on the cancellation instrument and had no knowledge of its filing until construction of the duplex was underway, and then they promptly acted; therefore, they contended, the equitable doctrines did not prevent them from enforcing the covenants.

The Millers responded that the home-owners' supporting evidence was not probative or sufficient summary judgment proof, and that issues of fact precluded the motion. Nevertheless, they asserted that the validity of the cancellation instrument was the crucial issue and was a question of law for the court's determination.

The Millers reasoned there was no need to notify the homeowners or afford them an opportunity to vote on the cancellation instrument since "those persons owning two-thirds (⅔) of the lots within the subdivision agreed to the Cancellation of Restriction." Moreover, the homeowners' failure to complain until after the construction of the duplex was almost completed invoked the doctrines of waiver, estoppel and laches; or alternatively, there were questions of fact concerning the application of the equitable doctrines which would preclude summary judgment.

Contained within their response was the Millers' own motion for summary judgment requesting the court to uphold the validity of the cancellation instrument and award them attorney's fees against the homeowners. In this regard, the Millers asserted that the equitable doctrines were established as a matter of law, and the homeowners were precluded from action.

The trial court denied the Millers' motion, and granted the homeowners' motion. By its judgment, the trial court decreed that the covenants impressed upon Lots 1 through 61 and Lots 71 through 106, were effective from their date of inception to the present, and that the cancellation instrument was void and of no force or effect, and ordered the Millers to bring the structure on Lot 51 into compliance with the restrictive covenants. The issues of damages and attorney's fees were severed from the present action, resulting in a final judgment from which the Millers perfected this appeal, presenting five points of error.

Initially, the Millers contend that the covenants were cancelled with respect to Lot 51, and secondly, that the trial court's judgment of injunctive relief with respect to Lot 51 was not supported by legally or factually sufficient evidence. By their third point of error,

they contend that the homeowners were precluded from seeking injunctive relief by "the doctrines of waiver and/or estoppel and/or laches." In the alternative, the Millers contend the summary judgment should be reversed to resolve fact issues concerning (4) the method of the cancellation provisions of the covenants, and (5) whether the homeowners were precluded from seeking injunctive relief by "the doctrines of waiver and/or estoppel and/or laches." The contentions of error will be discussed in logical sequence.

■ In this summary judgment proceeding, the homeowners assumed the burden to prove that there exists no genuine issue of material fact and that they were entitled to judgment as a matter of law. *Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972). If the homeowners established a right to summary judgment, the Millers had the burden to present reasons to avoid the homeowners' entitlement to summary judgment. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 (Tex.1979).

The core of this appeal is the Millers' initial contention that the restrictions imposed on Lot 51 by the covenants were "validly cancelled" by the cancellation instrument. If this is so, we must reverse the judgment; if this is not so, we must affirm.

■ In order for a subsequent instrument to amend the original restrictive covenants governing a subdivision such as Pine Grove Estates, three conditions must be met. First, the instrument creating the original restrictions must establish both the right to amend such restrictions and the method of amendment. *Couch v. Southern Methodist University,* 10 S.W.2d 973, 974 (Tex.Comm'n App.1928, judgm't adopted); *Loving v. Clem,* 30 S.W.2d 590, 592 (Tex.Civ.App.—Dallas 1930, writ ref'd). Second, the right to amend such restrictions implies only those changes contemplating a correction, improvement, or reformation of the agreement rather than a complete destruction of it. *Couch v. Southern Methodist University,* 10 S.W.2d at 974. Third, the amendment to the restrictions may not be illegal or against public policy. *Harrison v. Air Park Estates Zoning Com-*

*mittee,* 533 S.W.2d 108, 111 (Tex.Civ.App.—Dallas 1976, no writ).

The amendment provision established the right and a method for amendment of the covenants. The provisions of the cancellation instrument did not purport to destroy the restrictive covenants, but only to amend them by removing their imposition on the six designated lots. And the provisions of the cancellation instrument were neither illegal nor against public policy. *Id.* Ergo, the question for resolution is whether the method utilized was effective to amend the covenants as directed by the requirements of the amendment provision.

The homeowners hinge their negative response to the question on the initial language of the requirement that the filing must be "an instrument signed by two-thirds (⅔) of the then owners of building sites or building plots." Therefore, the homeowners contend, the signatures of two couples on the cancellation instrument fell short of the required signatures of two-thirds of the lot owners.

The Millers respond to the question in the affirmative, hinging their contention on the parenthetical statement in the amendment provision that "each building site or building plot to have one vote." The Millers contend that the meaning intended is that owners of multiple lots within Pine Grove Estates have multiple votes with regard to amendments, thus, they and the Sandersons as owners of 71 of the 96 lots represented two-thirds of the lots, which was sufficient to amend the covenants without concern for, or notice to, the owners of the remaining lots.

■ The mere disagreement over the interpretation of the amendment provision does not make it ambiguous. *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981). The question whether the provision is ambiguous is a question of law for the court. *Fisk Elec. v. Constructors & Associates,* 888 S.W.2d 813, 814 (Tex.1994). And, because the amendment provision is so worded that it can be given a certain legal meaning, it is not ambiguous, and we will construe it as a matter of law. *Coker v. Coker,* 650 S.W.2d 391, 393–94 (Tex.1983). We will give effect to the objective intention of the drafter as expressed or as is apparent in the amend-

ment provision. *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968); *Meyerland Community Imp. Ass'n v. Temple,* 700 S.W.2d 263, 267 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

■ The power to amend the covenants is controlled by the method, and in the manner, provided for in the amendment provision. *Norwood v. Davis,* 345 S.W.2d 944, 948 (Tex.Civ.App.—Austin 1961, no writ). The method required by the amendment provision is the signature of "two-thirds (⅔) of the then owners of building sites or building plots, (each building site or building plot to have one vote)." We construe the language of the covenants to mean what it says, *i.e.,* two-thirds of the then owners of the lots, not the owners of the majority of the lots. *Accord French v. Diamond Hill–Jarvis Civic League,* 724 S.W.2d 921, 923 (Tex.App.—Fort Worth 1987, writ ref'd n.r.e.).

This obtains, because the parenthetical statement cannot, as the Millers portend, be taken alone to impose a method requiring consent of the owners of two-thirds of the lots, leaving the initial sentence meaningless. *Coker v. Coker,* 650 S.W.2d at 393. The parenthetical is used by way of comment, explanation or translation in a sentence that is structurally independent of it, *i.e.,* the material inside the parens is not structurally necessary to the sentence. Texas Law Review Manual on Usage & Style rule B:8:1. Thus, when all parts of the amendment provision are read together contextually, as they must be, *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994), the parenthetical instructs that each lot is entitled to one vote even though there may be multiple owners of the lot, rather than indicating that owners of multiple lots are afforded multiple votes.

■ Resultantly, the filing of an instrument purporting to cancel the restrictions signed by only two couples falls far short of the required filing of an instrument signed by two-thirds of the lot owners in Pine Grove Estates. Nor did the filing give the homeowners constructive notice of it, for it operated only prospectively and not retrospectively to those anterior holders of an interest in the

lots. *Biswell v. Gladney,* 182 S.W. 1168, 1174 (Tex.Civ.App.—Amarillo 1916), *aff'd as modified,* 213 S.W. 256 (Tex.App.1919). Consequently, the cancellation instrument was void ab initio and was of no effect. The cases relied upon by the Millers for their contention that the voting rights be exercised on a per lot basis do not alter this conclusion, because the language of the restrictions in those cases manifested an intent that the voting rights be so exercised. The Millers' first point of error is overruled.

This determination pretermits a determination of the Millers' second point of error, by which they contend the evidence was legally and factually insufficient to support the judgment. Similarly, a discussion of their fourth point of error, by which they maintain that questions of fact exist concerning the construction of the procedure for removal of the restrictions imposed by the covenants, is pretermitted. Tex.R.App.P. 90(a).

Central to the Millers' third and fifth points of error is their contention that the trial court erred in rendering summary judgment for the homeowners for injunctive relief, because "the doctrines of waiver and/or estoppel and/or laches" were established as a matter of law or, alternatively, there are unresolved fact issues with respect to whether the doctrines precluded the homeowners from seeking injunctive relief. In this regard, the summary judgment does not expressly speak to injunctive relief; however, the parties have treated the order to bring the structure on Lot 51 into compliance with the restrictive covenants as the grant of injunctive relief.

The Millers' invocation of waiver, estoppel and laches is their interposition of affirmative defenses to avoid the homeowners' entitlement to summary judgment. Tex.R.Civ.P. 94. Thus, to avoid the summary judgment, they had to conclusively establish every element of at least one of the defenses, *Swilley v. Hughes,* 488 S.W.2d at 67, or, alternatively, to raise a question of fact regarding the application of at least one of the doctrines.

In pressing their contention that they established waiver, estoppel and laches as a matter of law, the Millers assert that they began building the duplex in February or March of 1992, the homeowners did not request the construction be stopped until June of 1992, and did not file the underlying suit until 28 September 1993. On these facts, the Millers argue the homeowners are precluded from obtaining injunctive relief by the doctrine of waiver and the equitable defenses of laches and estoppel.

In so arguing, the Millers liken this situation to those in *Barksdale v. Allison,* 210 S.W.2d 616 (Tex.Civ.App.—Eastland 1948, no writ), and similar situations where inaction of the complaining parties denied them the relief sought. However, by making the comparisons, the Millers have slighted the actions of the homeowners to protect their rights against the invocation of the doctrines. In doing so, the Millers attribute to the homeowners the inaction of appellants like the one in *Barksdale* who, knowing and being told a mercantile building was intended to be, and was being, constructed in a residential district waited until the building was completed to seek injunctive relief, which was refused, and lost, by laches and estoppel. 210 S.W.2d at 617. But the *Barksdale* situation is not the one depicted by this record.

The Millers' reliance on the statements that a Mr. Johnson, who they identify as a homeowner in the addition, and David and Lisa Wood were aware of the intent to construct a duplex on Lot 51 in April and May of 1992 is insufficient to controvert the otherwise unchallenged summary judgment evidence that the homeowners were not aware that the building being constructed on Lot 51 was violative of the covenants until 1 June 1992. Neither "Mr. Johnson" was shown to be one of the litigants, and the Woods are not among the litigating homeowners, and nothing in the record imparts their knowledge to the homeowners.

The evidence is uncontroverted that less than four days after their first notice of the violation on 1 June 1992, the homeowners met to "discuss what action could be taken with respect to the structure," and decided to form a committee to talk to the Millers and the Sandersons. On 6 June 1992, the committee met with the two couples and discussed the possibility of turning the structure

into a clubhouse. But, the next day, Anthony Romond Miller determined that the homeowners were trying to divide the sisters, Judy and Carolyn, and refused to modify the duplex as discussed.

On 12 June 1992, the committee met with an attorney to discuss their options and amicably resolve the matter, and the attorney contacted the Millers' attorney the same day. Those negotiations resulted in the filing of a lawsuit which was later resolved by the execution of the ratification on 23 April 1993. Upon the Millers' refusal to execute the ratification, or to bring the structure on Lot 51 into compliance with the covenants, the homeowners initiated the underlying suit on 28 September 1993.

The parties stipulated that there was no waiver or laches by the homeowners after the contact between their respective attorneys on 12 June 1992. However, the Millers' reserved the right to assert waiver and laches from the time of their commencement of construction until the contact between the attorneys.

Then, upon this record, the period available for waiver, estoppel and laches to occur was from 1 June 1992 until 12 June 1992. The Millers do not contend that during this period of time the homeowners overtly relinquished their right to insist upon the restrictive covenants; rather, they contend that by their inaction the homeowners impliedly waived that right, are estopped to assert it, and are barred by laches from asserting it.

 Inaction, to be interpreted as an intention of waiver, is generally accompanied by other circumstances, such as an unreasonable length of time, evidencing the intent. *Self v. Kinder,* 474 S.W.2d 632, 634 (Tex.Civ. App.—San Antonio 1971, writ ref'd n.r.e.). In relation to waiver, estoppel arises when one is not permitted to disavow his conduct which induced another to act detrimentally in reliance upon it, and laches occurs when one unreasonably delays in asserting his rights against another who in good faith has changed his position to his detriment because of the delay. *Campbell v. Pirtle,* 790 S.W.2d 372, 374–75 (Tex.App.—Amarillo 1990, orig. proceeding).

To the contrary, this record reveals that the homeowners, upon learning of the Millers' violation of the restrictive covenants, took action forthwith to rectify the violation. Thus, the record does not show an unreasonable delay on the part of the homeowners, nor other circumstances either evidencing, or raising a fact issue of, waiver. *Self v. Kinder,* 474 S.W.2d at 634. And there is no evidence to show, or to raise a fact issue, that the Millers changed their position to their detriment between 1 June 1992, when the homeowners learned of the violation, and 12 June 1992, after which it was stipulated the equitable defenses did not apply.

Consequently, when all of the summary judgment evidence presented in connection with both motions is considered, as it must be, *DeBord v. Muller,* 446 S.W.2d 299, 301 (Tex.1969), it establishes as a matter of law the absence of waiver, estoppel and laches on the part of the homeowners. Given this state of the record, the trial court correctly rendered summary judgment for the homeowners and denied the Millers' motion for summary judgment. The Millers' third and fifth points of error are overruled.

Accordingly, the judgment is affirmed.