### In re PEACHTREE LANE ASSOCIATES, LTD.

Nos. 96 C 5090, 96 C 5092, 96 C 7454.

United States District Court,
N.D. Illinois,
Eastern Division.

March 18, 1997.

Jeffrey Wayne Finke, Thomas E. Raleigh, Paul Andrew Sundberg, Raleigh and Helms, Chicago, IL, for Appellants.

Mark P. Naughton, Jr., Rudnick & Wolfe, Chicago, IL, for Appellee.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This case, which consumed the time and apparently endless patience of Judge Barliant in the Bankruptcy Court for almost two years, is now before us for the third time in as many years. The appellants no doubt hope that this appeal will prove the truth of the old saw "third time is a charm." Unfortunately, after carefully reviewing the record and the briefs on appeal, we conclude that the saying has no application here. For the reasons set forth below, we affirm the decisions of the Bankruptcy Court.

A brief summary of the cases follows. For a much more detailed treatment of the facts, see the factual findings of Judge Barliant, reported at *In re Peachtree Lane Assocs., Ltd.,* 198 B.R. 272, 274–80 (Bankr.N.D.Ill. 1996), and our previous opinion, *In re Peachtree Lane Assocs., Ltd.,* 188 B.R. 815, 819–21 (N.D.Ill.1995) (*"Peachtree II "*).

On July 26, 1994, Peachtree Lane Associates ("Peachtree" or "Debtor"), a Texas limited partnership, filed for bankruptcy under chapter 11[1] in this district. The Debtor's principal asset was an apartment complex located in the town of Webster, Texas. Shortly after filing under Chapter 11, the Debtor filed an adversary action against Harry, Alan and Daniel Granader, the owners of a shopping center bordering the Peachtree apartment complex, to determine the extent of the bankruptcy estate. At issue was an easement over part of Peachtree's property, used by shopping center patrons for access and parking. The Debtor sought a declaratory judgment determining the parties' rights under the easement and a permanent injunction preventing any encroachment. The Debtor contended that the Granaders' shopping center parking lot contained parking spaces and landscaped islands that improperly trespassed upon the Debtor's property, which included a private road used by Peachtree residents as an access road to the apartment complex. The Granaders filed an answer and a six-count "conditional" counterclaim,[2] and moved for withdrawal of reference pursuant to 28 U.S.C. § 157(d).

Soon after filing the motion for withdrawal of reference in this court, the Granaders filed a motion in the Bankruptcy Court for an enlargement of time with respect to the bar date—the date by which all claims against the bankruptcy estate must be filed. The Bankruptcy Court granted that motion on October 25, 1994, and subsequently the Granaders' counterclaim was treated as a proof of claim in the bankruptcy proceedings. On November 18, 1994, this court denied the motion for withdrawal of reference, holding that the adversary action was a "core" proceeding subject to the Bankruptcy Court's jurisdiction and that the Granaders had no Seventh Amendment right to a jury trial in that action. *See Peachtree Lane Assocs., Ltd. v. Granader,* 175 B.R. 232, 237–38 (N.D.Ill.1994) (*"Peachtree I "*).

During the fall of 1994, the Granaders raised a number of challenges to the Bankruptcy Court's authority to hear the adversary action, including jurisdiction, venue, and abstention. The Bankruptcy Court denied the various motions to dismiss, abstain, or transfer venue in oral rulings. As part of its ruling on the venue issue, the Bankruptcy Court held (prior to our ruling that the counterclaim was a proof of claim against the estate that rendered the adversary action a core proceeding) that the Granaders lacked standing to challenge the venue of the bankruptcy case[3] because they were not creditors of the estate or other "interested parties."

---

1. Unless otherwise noted, all references to "chapter ——" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

2. We previously held that the designation of the counterclaim as "conditional" had no legal effect. *Peachtree Lane Assocs., Ltd. v. Granader,* 175 B.R. 232, 233 n. 1 (N.D.Ill.1994).

3. Because their challenge to venue of the adversary action was a foregone conclusion so long as the underlying bankruptcy case was venued in this district, *see* 28 U.S.C. § 1409(a) (proceedings "arising in or related to" a bankruptcy case are properly brought where the bankruptcy case is pending), the parties and the courts have all treated the Granaders' challenges to venue in the adversary action as applying to venue of the bankruptcy case.

Trial in the adversary action was held on several dates in November and December, 1994. The Bankruptcy Court issued an oral ruling on December 22, 1994, and a judgment order and permanent injunction on January 6, 1995. The court entered judgment in favor of the Debtor on its claims, finding that the Debtor owned the property over which the easement ran, and that certain portions of the Granaders' parking lot encroached upon the Debtor's property in a manner not permitted by the easement, which was for ingress and egress only. The court found that the Granaders had failed to meet their burden of establishing the numerous defenses that they asserted, including among others the defenses of laches, estoppel, and waiver. The court also concluded that the Granaders had not presented sufficient evidence to support their various counterclaims. About the same time, the court wrapped up the bankruptcy case, entering an order confirming the Debtor's second amended liquidating plan of reorganization dated November 30, 1994 (as modified December 21, 1994), and another order approving the sale of the apartment complex.

The Granaders timely appealed both the bankruptcy orders denying the Granaders standing to challenge the venue of the bankruptcy case, and the adversary action judgment ruling against them on the easement-related claims, to this court. We held that the Granaders did have standing to challenge venue in the bankruptcy case and remanded both cases to Judge Barliant for further proceedings on the venue issue. *See Peachtree II,* 188 B.R. at 831. In the course of these proceedings, which took place during the spring of 1996, the Bankruptcy Court held that certain discovery sought by the Granaders would not be permitted, venue in the Northern District of Illinois was proper in the bankruptcy case, and transfer of the case to Texas was not appropriate. This consolidated appeal by the Granaders from both the bankruptcy case and the adversary action followed.

The Granaders raise several issues on appeal. Their first and most lengthy contention is that the bankruptcy judge erred in finding that the Debtor's principal place of business was in the Northern District of Illinois, and that venue for the bankruptcy case was therefore proper in this district. In a related vein, the Granaders argue that the Bankruptcy Court should not have denied them certain discovery they contend was relevant and important to resolving the venue question. They then attack the adversary proceedings, asserting that the adversary complaint must be dismissed because its jurisdictional allegations were deficient, and that the Bankruptcy Court erred in ruling against them in the adversary action. We address each of these points in turn.

## I. THE BANKRUPTCY CASE

### A. Was Venue of the Bankruptcy Case Proper in this District?

As provided by 28 U.S.C. § 1408, a chapter 11 bankruptcy case may be commenced in any district in which the debtor had its domicile, residence, principal place of business, or principal assets, for the last 180 days preceding the filing of the case. 28 U.S.C. § 1408(1). As COLLIER and a great many other authorities note, the only venue tests that are meaningful with respect to a partnership such as the Debtor are the place where the principal assets are located and the principal place of business. 1 COLLIER ON BANKRUPTCY ¶ 4.01[2][d] (15th ed. rev.1996); *see also In re Washington, Perito & Dubuc,* 154 B.R. 853, 859 (Bankr.S.D.N.Y. 1993); *In re Industrial Pollution Control, Inc.,* 137 B.R. 176, 180 (Bankr.W.D.Pa.1992); *In re Nantucket Apartments Assocs.,* 80 B.R. 154, 156 (Bankr.E.D.Mo.1987). "Since the test is in the alternative, venue may properly lie in more than one district." *Washington,* 154 B.R. at 859; *see also In re Pavilion Place Assocs.,* 88 B.R. 32, 35 (Bankr.S.D.N.Y. 1988) ("the principal place of business provides an independent basis of venue" apart from the location of assets). It is undisputed that the Debtor's principal asset is the apartment complex in Texas. If the principal place of business is in this district, however, venue would be proper here.

Venue is presumed to be proper in the district where a bankruptcy case is filed, and the burden of proving otherwise is on

the party who has moved to transfer or dismiss the case. *See In re Holiday Towers, Inc.*, 18 B.R. 183, 186 (Bankr.S.D.Ohio 1982) ("The mere allegation by the debtor that its principal place of business is within this district is sufficient to establish a prima facie case in support of proper venue."); *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390 (2d Cir.1990) (burden of showing improper venue is upon movants). The issue is thus whether the Granaders met their burden to prove, by a preponderance of the evidence, that the Debtor's principal place of business was not in the Northern District of Illinois.

■ There are two components to the Bankruptcy Court's decision that venue was proper in this district. First, the court selected the legal test for evaluating the principal place of venue, applying the "major business decisions" test that focuses on the place where a debtor's significant decisions are reached. As the determination of the proper test to apply is a conclusion of law, we review that determination *de novo*. Second, the Bankruptcy Court applied the test and found that, on the evidence presented, this Debtor's principal place of business was within the Northern District of Illinois. As this conclusion is a finding of fact, *In re Commonwealth Oil Refining Co. Inc. ["CORCO"]*, 596 F.2d 1239, 1241 (5th Cir.1979), we review it only for clear error. *In re Yonikus*, 996 F.2d 866, 868 (7th Cir.1993).

### 1. Selecting the Proper Test

■ In our last published opinion in this case, we noted that courts have often looked to the place where the debtor's major business decisions are made[4] in determining the

debtor's principal place of business. *Peachtree II*, 188 B.R. at 830 (citing cases). On remand for a factual finding regarding the Debtor's principal place of business, the Bankruptcy Court properly stated that it was not bound by our discussion, and conducted its own investigation, ultimately concluding that the "major business decisions" test (sometimes referred to as the "nerve center" test) was indeed the prevalent and most appropriate test. *In re Peachtree Lane Assocs., Ltd.*, 198 B.R. at 281. As our previous opinion would indicate, we believe that this determination was correct.

The Granaders contend that the proper test for evaluating a debtor's principal place of business is an "operational" test that looks to the place where day-to-day business is transacted or where the majority of the debtor's dealings with the public take place. They rely heavily on two cases, *Royal Indemnity Co. v. American Bond & Mortgage Co.*, 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100 (1933), and *In re Guarantee Acceptance Corp. v. Fidelity Mortgage Investors*, 544 F.2d 449 (10th Cir.1976).[5] Unfortunately for the Granaders, neither of these cases provides the support for the operational test that they claim.

In *Royal Indemnity*, the Supreme Court addressed the issue of the proper venue for a bankruptcy case when the debtor had ceased to do business and was in receivership. A bankruptcy case was already underway in the Northern District of Illinois when other creditors filed against the company in Maine, the state of its incorporation. Royal Indemnity sought to transfer the Maine action to Illinois and join it with the case pending there. The Maine creditors objected on the

---

4. In discussing all of these tests, we are implicitly referring to the 180 days before the filing of the bankruptcy.

5. The Granaders also cite to cases from the Second, Fourth, Fifth, Sixth and Eighth Circuit courts of appeal to support their position. However, the cases cited all date from between 1913 and 1935, and at least two circuits have changed their approach since then. *See CORCO*, 596 F.2d 1239 (5th Cir.1979) (venue was proper in the district where a debtor managed its business); *Capitol Motor Courts v. Le Blanc Corp.*, 201 F.2d 356 (2d Cir.1953) (the place from which the debtor's financial affairs had been controlled,

rather than the place of its day-to-day activities, was the principal place of business); *see also In re Landmark Capital Co.*, 19 B.R. 342, 347 (Bankr.S.D.N.Y.) (bankruptcy case cited widely in the Second Circuit, holding that "the place where the debtor makes its major business decisions constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production facilities"), *aff'd*, 20 B.R. 220 (S.D.N.Y.1982). The Tenth Circuit is the only federal appeals court in the last sixty years to interpret "principal place of business" favorably to the Granaders.

ground that, as the company was no longer "doing business," it could not have a principal place of business in the usual sense, and thus any proceedings should be venued in the company's place of incorporation.

The Court rejected this argument and held that the debtor's principal place of business was the place where the receivers were winding up the business (which was also where the company's principal place of business had been when it was operating). The Court explained:

> Whether its affairs were in the course of winding up or were being managed in the hope of restoration of full control to the corporate agencies is immaterial. Until a winding up had been effected the business formerly conducted by the company in Chicago continued to be the respondent's business and not that of another, and the place where that business was conducted, whether by receivers or by the corporate officers, still remained the 'principal place of business,' in the common acceptation of the phrase.

The Court went on to say:

> In these days of corporate activity it is not unusual for a company chartered in one of the states to conduct most, if not all its business in another state far removed from that of incorporation. Considerations of convenience no doubt prompted the Congress to permit the initiation of a bankruptcy in the state where the business is in fact transacted rather than that of the domicile, where often none is done.

*Royal Indemnity,* 289 U.S. at 169, 53 S.Ct. at 553.

As can easily be seen, nothing in the *Royal Indemnity* holding directly speaks to the situation at issue here. The Court was faced first with the question of whether a company in receivership still had a "principal place of business," and the Court held that it did—the place where the company's affairs were being wound up. The Court then considered whether venue was more properly exercised there or in the company's domicile state, and concluded that, of these two choices, venue was more appropriate in the debtor's principal place of business. The Granaders' invocation of the Court's phrase "the state where the business is in fact transacted" as supporting an operational test misuses that phrase by taking it out of context. The Court only interpreted the meaning of "principal place of business" in the context of a company in receivership, and never purported to pass judgment on the question presented here: whether "principal place of business" refers to the location of the debtor's day-to-day operations, or to the place where the debtor's major business decisions are reached. Thus, *Royal Indemnity* is readily distinguishable from this case, and as such is neither binding nor even particularly persuasive authority for (because it does not address) the issue presented here.

The Tenth Circuit's decision in *In re Guarantee Acceptance Corp. v. Fidelity Mortgage Investors,* 544 F.2d 449 (10th Cir.1976) is more relevant, but once again the Granaders mischaracterize its holding. It is true that the Tenth Circuit ultimately decided that, in that case, the debtor's principal place of business was in Oklahoma, where the debtor's sole asset, a condominium townhouse project that was then under construction, was located. Nevertheless, the court did not adopt the rigid rule that the Granaders urge here—that the principal place of business must always be where the debtor company's day-to-day operations take place. Instead, the Tenth Circuit stated merely that "the corporate headquarters and offices are not necessarily the principal place of business of a corporation." *Id.* at 452. The Tenth Circuit's ultimate holding in *Guarantee Acceptance Corporation* was simply that the lower court's factual finding regarding the principal place of business was not clear error. This can hardly be said to be an unqualified endorsement of the operational test the Granaders advocate.

Moreover, two other circuit courts of appeal have approved versions of the "major business decisions" test applied by the Bankruptcy Court here. *See CORCO,* 596 F.2d 1239 (5th Cir.1979); *Capitol Motor Courts v. Le Blanc Corp.,* 201 F.2d 356 (2d Cir.1953). *CORCO* in particular contains an excellent overview of the history of venue tests in

chapter 11 proceedings.[6] *See CORCO,* 596 F.2d at 1244–46. The Fifth Circuit noted that the determination of a debtor's principal place of business has long been marked by competing approaches:

> Prior to the adoption of [Federal Bankruptcy] Rule [of Procedure] 116, the courts were divided on the question whether a debtor's principal place of business is located in the district where the debtor maintains its general executive offices or in the district where the debtor operates its production facilities. [Listing cases.] Although all courts agreed that the location of a debtor's principal place of business is a question of fact, either production or management facts were emphasized, depending on the circuit's preference.

*Id.* at 1245. The Fifth Circuit noted that the adoption of Rule 116 in 1973 was significant in the development of venue law for chapter 11 proceedings because it changed the chapter 11 venue provision (which until then limited venue to the company's principal place of business) to mirror the venue provision for chapter 10 (under which venue was proper either in the company's principal place of business or where the principal assets were located). Id. at 1244. Thus, before Rule 116 was adopted, the phrase "principal place of business" in chapter 11 venue determinations encompassed the location of the company's principal assets. After the adoption, the new language of Rule 116(a)(2) made clear that "a debtor's principal place of business is not necessarily at the same location as its principal assets," and that chapter 11 venue would properly lie in either place.[7] *Id.* at 1244–45. The Fifth Circuit explained that "[t]he emphasis of earlier decisions on the location of the debtor's production facilities is no longer appropriate because the location of the debt-

or's principal assets is now an independent basis of venue." *Id.* at 1245.

The court noted its agreement (as do we) with *In re Portex Oil Co.,* 30 F.Supp. 138, 140 (D.Or.1939), *aff'd sub nom. Clark Bros. Co. v. Portex Oil Co.,* 113 F.2d 45 (9th Cir. 1940), which commented on the juxtaposition of the two phrases in the old chapter 10 venue provision:

> A distinction must have been intended between the two points where jurisdiction could be founded.... The intent must have been to permit a corporation which habitually transacted its corporate business at some point to bring proceedings there.... [T]he distinction noted in the statute permits administration if the petition is filed in the district where the principal place of business is located, for the very purpose of allowing the internal administration of a company to be settled at the point where those interested in it chose primarily to conduct their business.

We also agree with the Fifth Circuit that "[a]llowing venue in the district where a debtor manages its business is particularly appropriate" in proceedings under chapters 10 and 11, in which "[t]he debtor is maintained as a going enterprise and its finances are put back in order. Where the [company] transacts its [company] business is a logical place for venue in such proceedings." *CORCO,* 596 F.2d at 1246.

This court finds *CORCO*'s discussion of venue in chapter 11 cases to be thorough, well-reasoned and persuasive. We also note the many decisions applying the "major business decisions" test to determine the principal place of business. *See, e.g., In re Washington, Perito & Dubuc,* 154 B.R. 853 (Bankr.S.D.N.Y.1993); *In re Wilson,* 154

---

**6.** Indeed, we place less reliance on the Tenth Circuit's opinion in *Guarantee Acceptance Corporation* because that case was decided without the benefit of the well-researched exposition of chapter 11 venue in *CORCO.* We note that the Tenth Circuit has not re-visited the "operational" versus "major business decisions" debate since *Guarantee Acceptance Corporation,* and in fact no court in that circuit has even cited that case as support for the operational test.

**7.** Rule 116 was ultimately superseded by 28 U.S.C. § 1408, the current provision governing venue in chapter 11 proceedings. Section 1408 incorporates Rule 116's distinction between "principal place of business" and "place of principal assets".

B.R. 769, 772 (Bankr.M.D.Ala.1993) (venue in a partnership's chapter 11 case is "generally appropriate in the district where the partnership offices are located," where the debtor's major business decisions are likely to be made); *In re Suzanne de Lyon, Inc.*, 125 B.R. 863, 867 (Bankr.S.D.N.Y.1991) ("where the debtor makes its major business decisions ... constitutes the principal place of business of a debtor, notwithstanding the physical location of its assets or production"); *In re Midland Assocs.*, 121 B.R. 459, 460 (Bankr.E.D.Pa.1990) (treating the place where the general partner of a debtor limited partnership made the debtor's major business decisions as the debtor's principal place of business); *In re Oklahoma City Assocs.*, 98 B.R. 194, 198 (Bankr.E.D.Pa.1989) ("it is generally and correctly held that the place where the debtor makes its major business decisions constitutes the principal place of business of that debtor"); *In re Garden Manor Assocs., L.P.*, 99 B.R. 551, 553 (Bankr.S.D.N.Y.1988) (venue in limited partnership's chapter 11 case was proper in New York, where the major business decisions were made, although the sole asset—an apartment complex—was in Arizona and the day-to-day property management decisions were made in Arizona); *In re Greenhaven Assocs., Ltd.*, 93 B.R. 35, 40 (Bankr.S.D.N.Y. 1988) (venue was proper in New York, where the general partner of a single-asset real estate limited partnership had its principal place of business); *In re The Willows Ltd. Partnership*, 87 B.R. 684, 685 (Bankr. S.D.Ala.1988) (principal place of business for single-asset real estate limited partnership was where the debtor made its major business decisions, not where the apartment complex was located); *In re 1606 New Hampshire Avenue Assocs.*, 85 B.R. 298, 302–03 (Bankr.E.D.Pa.1988) ("[t]he clear weight of authority" supported venue in Pennsylvania, where "significant management decisions" of

the debtor were made, although the debtor's sole asset—an office building—was in D.C.); *In re Pavilion Place Assocs.*, 88 B.R. 32, 35 (Bankr.S.D.N.Y.1988) (although daily operations of the limited partnership's shopping center took place elsewhere, they were overseen by managers in New York and the principal place of business was in New York); *In re Baltimore Food Sys., Inc.*, 71 B.R. 795, 801 (Bankr.D.S.C.1986) (debtor's principal place of business was where the company's sole chief executive and decision-maker had his offices); *In re Pickwick Place Ltd. Partnership*, 63 B.R. 290, 291 (Bankr.N.D.Ill. 1986) (venue proper where all the general partners of a real estate limited partnership were located); *In re Holiday Towers, Inc.*, 18 B.R. 183, 186–87 (Bankr.S.D.Ohio 1982) (discussing debate between "nerve center" test, which looks to the place of the general offices from which "broad management decisions emanate "—and "bulk of activity" test—place of principal assets and/or day-to-day operations; concluding that the "bulk of activity" test relates only to determining the location of principal assets, and not the principal place of business, which is determined by the "nerve center" test); *In re Greenridge Apartments*, 13 B.R. 510, 513 (Bankr.D.Haw. 1981) (principal place of business was where debtor made decisions regarding investments in realty, not where apartment complex was located).[8] A case decided by another bankruptcy court in this district, *In re One-Eighty Investments, Ltd.*, 18 B.R. 725 (Bankr.N.D.Ill.1981), is interesting because it involved similar facts: the debtor was a limited partnership whose sole asset was an apartment complex in Texas. Day-to-day operations were carried out in Texas. The debtor's sole general partner was located in Illinois, and that is where its major business decisions were made. The court held that transfer of the case from Illinois to Texas was not warranted. *Id.* at 730. In light of

---

**8.** In many of these cases, the court ultimately transferred the case to the place where the principal assets were located, at the request of the creditors. Nevertheless, each of those courts first found venue proper in the debtor's principal place of business as determined by the "major business decisions" test, and the subsequent discretionary transfer of the cases does not undermine those holdings. Although the Granaders requested such a discretionary transfer of the bankruptcy case, they have not appealed the Bankruptcy Court's denial of that motion. See Granaders' Cons.Appeal Br. at 1–2 (listing the issues on appeal).

all of these cases, we hold that the Bankruptcy Court did not err in selecting the "major business decisions" test to determine the Debtor's principal place of business.

■ The Granaders raise several statutory interpretation arguments about the correct construction of "principal place of business," almost all of which mischaracterize either the Bankruptcy Court's holdings or the law. For instance, they complain that the "nerve center" test applied by the Bankruptcy Court is drawn from the case law on diversity jurisdiction, an improper source for bankruptcy principles because of the different policy considerations at work in the determination of a corporation's principal place of business for diversity purposes. *See CORCO*, 596 F.2d at 1246 n. 17. We agree that, as a general matter, tests for a corporation's principal place of business in diversity cases should not be imported wholesale into bankruptcy venue law. This is not what the Bankruptcy Court did, however. Rather, the Bankruptcy Court applied the "major business decisions" test, a recognized test for principal place of business in bankruptcy cases, but simply referred to that test on occasion as a "nerve center" test. In this, the Bankruptcy Court no doubt was merely echoing this court's statement in the opinion remanding the venue issue. *See Peachtree I*, 188 B.R. at 830 ("In determining the principal place of business of a partnership or corporation, courts have routinely looked to where significant business decisions are made, sometimes described as the debtor's "nerve center."). It is clear that any error in referring to the "nerve center" test is one of terminology, not substance or policy.[9]

The Granaders also argue that the Bankruptcy Court wrongly conflated "principal place of business" with "principal executive office." They then go on to discuss the language adopted by Congress in the 1933 statute on venue in railroad bankruptcy cases ("principal executive or operating office") in comparison with the language used to describe venue options in the 1934 act creating the predecessor of chapter 10 ("principal place of business"), all in an effort to show that Congress did not intend the two phrases to be synonymous. The flaw lies in the first step here: the Bankruptcy Court did not wrongly equate these two phrases. Rather, the Bankruptcy Court applied the "major business decisions" test in determining the Debtor's principal place of business. Indeed, if the Bankruptcy Court had applied the "principal executive or operating office" test set forth in the old railroad bankruptcy statutes, it most likely would have found that venue was proper in Texas, the state where the Debtor was chartered and the place of its "operating office." As the Granaders point out, the application of such a test would be inappropriate here. It is indisputable that the Bankruptcy Court did not make this particular error.

The Granaders also argue that the meaning of the term "principal place of business" has remained unchanged since 1898, the year in which the first national bankruptcy act was enacted. As explained in *CORCO*'s thoughtful opinion, this is simply untrue. While the literal language may have remained the same, different courts interpreted that language differently among themselves and over time. Moreover, the splitting off of the "principal assets" factor from the overall concept of "principal place of business" in 1973 surely effected a change in the latter phrase's interpretation,

---

9. The Granaders' argument on this point is seriously undermined by the fact that they have taken the opposite stance on several occasions. *See* Granaders' Cons.Appeal Br. at 39 ("bankruptcy venue is no different than venue in other civil federal contexts"); *id.* at 46 n. 10 (citing a non-bankruptcy case for the proposition that a company's principal place of business is the location set forth in its charter); Granaders' Reply in Supp. of Motions to Compel and For Leave to Serve Add'l Interr. at 3 & n. 1 (relying upon a Seventh Circuit diversity case to make a point about the appropriate interpretation of "principal place of business" and asserting that Congress expressly commanded that the development of diversity case law on "principal place of business" was to be guided by precedents construing the same language in the Bankruptcy Act). The court finds these arguments equally or more compelling than their current contention that diversity jurisprudence can make no contribution to bankruptcy venue law.

simply because courts no longer had to weigh the place where the principal assets (and often the daily operation of those assets) were located in evaluating the debtor's principal place of business.

For all of these reasons, we reject the Granaders' arguments and affirm the Bankruptcy Court's decision to apply the "major business decisions" test.

### 2. Determining the Principal Place of Business

■ In reviewing the Bankruptcy Court's factual determination that the Debtor's principal place of business lay in the Northern District of Illinois under the "major business decisions" test, we look only to whether or not the finding was clearly erroneous. "A finding is 'erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The Granaders raise fewer objections to the Bankruptcy Court's application of the "major business decisions" test than they do to its selection of that test in the first place. Their first contention is that the cases relied upon by the Bankruptcy Court were factually distinguishable. The Granaders claim that, in most if not all of these cases (cited in *In re Peachtree Lane Assocs., Ltd.*, 198 B.R. at 280–82), the debtor was far more intimately involved in the daily operations of its asset(s), providing greater justification for those courts' findings that the business was in fact "managed" at the executive offices. In essence, the Granaders are arguing that here,

the facts indicating an active management of the Debtor's business in Chicago are so much sparser than those presented in the cases cited in the opinion that they do not justify the finding of "principal place of business" reached in those cases.

The Granaders are hampered in this argument by the fact that the burden is upon them to prove that the Debtor's major business decisions were made somewhere other than this district, not upon the Debtor to prove that the decisions were made here. Thus, the Debtor was under no obligation to present facts that rose to some level of active management suggested by other venue cases.[10]  Rather, the Granaders were required to carry the burden of showing that major business decisions were made outside of Illinois, and that such decisions were not made here. . This they did not do. Indeed, on appeal they do not even contend that they met this burden. Their attempts to factually distinguish the cited cases cannot remedy this simple failure of proof.

The Granaders also argue that the Bankruptcy Court's analysis was misguided because it wrongly focused on the place where an entity several rungs up the ownership/control ladder (Kemper Corporation) conducted its business, rather than the place where the Debtor itself conducted its business. The Granaders correctly note that there are many formal layers between Kemper Corporation and the Debtor. The Debtor is a Texas limited partnership. Its sole general partner is Kemper/Cymrot Partners PT, another limited partnership, whose sole general partner is Kilico Realty Corporation, a holding company for Kemper real estate investments. In addition, there are two more layers within the Kemper parent/subsidiary structure before the actual seat of control, Kemper Corporation, is reached. Nevertheless, a focus on the details of Kemper's corporate structure ignores the only

---

10. For the record, the court has carefully reviewed the evidence adduced during the venue proceedings (and throughout the case), and finds that even if the burden of proof had been upon the Debtor, the Bankruptcy Court's determination that the Debtor's major business decisions were made in Chicago was well-supported. The Debtor presented substantial evidence that the Debtor's business was overseen and directed from Chicago.

relevant question here: where were the Debtor's major business decisions made? In this case, the evidence was undisputed that control over the Debtor was exercised by Kemper real estate portfolio employees, and that they made major business decisions for the Debtor in Chicago. The fact that those decision-makers were not directly employed by the Debtor itself is of no legal moment.[11]

A theme running through much of the Granaders' argument on appeal is that the actual (and only readily apparent) business of the Debtor was running an apartment complex, not being an investment item in a portfolio thousands of miles away; thus, its actual business was conducted in Texas, not in Illinois. While we are sympathetic to such an argument, it obscures the reality that Peachtree was *both* of these things, an apartment complex and also an investment. *Compare In re Nantucket Apartments Assocs.*, 80 B.R. 154, 156 (Bankr.E.D.Mo.1987) (the only business of a real estate limited partnership was the operation of the realty asset) and *In re Greenridge Apartments*, 13 B.R. 510, 513 (Bankr.D.Haw.1981) (debtor real estate limited partnership was "in the business of investing in real estate"). That its existence as an investment portfolio item was more abstract and less publicly obvious does not make that side of Peachtree's business any less deserving of recognition. In *Capitol Motor Courts v. Le Blanc Corp.*, 201 F.2d 356 (2d Cir.1953), the Second Circuit considered the principal place of a business that had always conducted its operations in Louisiana, but had recently been bought by New York investors, and concluded that the principal place of business was where the company's "financial heart" lay: "[a]s the appellees well say, the troubles of the business were not manufac-

turing but financial, and the heart—and also body—of that was in New York." *Id.* at 359. Likewise, the troubles that brought Peachtree into federal court in Illinois were not that its roof leaked but that its financial and investment status had decreased. Although "[o]ne may perhaps have some sympathy for ... local creditors of a ... concern who suddenly find that its financial heart" is many miles away, *id.*, that does not permit a court to ignore the location of that financial place of business. "The efficacy of the bankruptcy proceeding depends on the court's ability to control and marshal the assets of the debtor wherever located." *In re Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir.1996). The Bankruptcy Court did not err in finding that the Debtor's principal place of business was in the Northern District of Illinois.

**B. Denial of Certain Discovery Requests**

■ As part of their attack on the venue ruling, the Granaders contend that the Bankruptcy Court wrongly denied them certain discovery relating to venue. Specifically, the Granaders first requested documents such as travel schedules; travel expense reimbursement documents including "airline, lodging, rental car, food and other receipts"; long distance telephone records; and other similar documents relating to the 180-day period before the bankruptcy was filed, for Michael Weisel, Vincent Cozzi and John Neal. These three men were all employees of Kemper Corporation. Weisel, a vice president of Kemper for real estate investments, was designated by the Debtor as its principal decision-maker during the relevant period. Cozzi was a senior analyst in the real estate investments group who monitored the month-to-month performance of Peachtree

---

11. The Granaders also raise arguments that are plainly meritless and undeserving of extended analysis. *See generally* Granaders' Cons.Appeal Br. at 36–40. For instance, they contend that the purpose of the bankruptcy venue statute is to protect defendants from having to litigate in inconvenient fora, and because that result was not achieved here, the Bankruptcy Court's decisions were wrong. The limitations of such a result-oriented approach are obvious. Other quasi-equitable arguments, which portray the Granaders as innocent defendants dragged into a distant

bankruptcy proceeding against their will, neglect to mention that these defendants actively asserted claims against the Debtor, thus causing their own entanglement in the bankruptcy case. The Granaders also complain that the Debtor unfairly used the distance from Texas against them by opposing the issuance of trial subpoenas to witnesses more than 100 miles away. In reality, the Bankruptcy Court quite properly denied the issuance of such subpoenas because the testimony of the proposed witnesses was irrelevant or duplicative of other evidence. 5/9/96 Tr. at 18–57.

and reported to Weisel. Neal was a senior vice president who supervised Weisel and was a member of the Kemper Real Estate Investment Committee, the body that ultimately approved recommendations regarding assets in the real estate investment portfolio. The Granaders' request was apparently based on indications that Weisel and, to a lesser extent, Cozzi, spent time out of the Chicago office during the 180–day period.[12] Indeed, Weisel testified at his deposition that although he worked in Chicago and maintained his office there, he lives in North Carolina. Weisel has run for office in North Carolina.

The Debtor objected to these document requests as irrelevant and unduly burdensome. The Bankruptcy Court denied the Granaders' motion to compel production of these documents, but required the Debtor to provide a statement listing the employees' home addresses, and all business addresses where the employees "conducted the business of the Debtor on more than a casual basis." Granaders' Cons.Appeal Br., Ex. 4 (Order dated 2/29/96). Immediately thereafter, the Granaders issued subpoenas to various credit card companies, telephone companies and long-distance telephone companies, seeking essentially the same information they had sought from the Debtor, but relating to Weisel only. The Debtor moved to quash, and the Bankruptcy Court granted the motion on the ground that "[t]his evidence is so far from the central issues in this hearing and so unlikely to produce any evidence that's worth the burden on the respondents ." See 3/20/96 Tr. at 5.

Because the trial court "is in the best position to decide the proper scope of discovery and settle any discovery disputes," the ability to direct discovery is within a trial court's sound discretion, and we review discovery orders only for abuse of that discretion. Gile v. United Airlines, Inc., 95 F.3d 492, 495 (7th Cir.1996).

We will not find a [trial] court abused its discretion unless one or more of the following circumstances is present: (1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; of (4) the decision clearly appears arbitrary. In addition to according substantial deference to the [trial] court's discovery decisions, we will not reverse a decision to limit discovery "absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant."

*Id.* (*quoting Searls v. Glasser,* 64 F.3d 1061, 1068 (7th Cir.1995)).

As an initial matter, we believe that the legal basis for the Bankruptcy Court's ruling was not erroneous. It is by no means clear from the case law that in determining venue a bankruptcy court should look to the location of the individual decision-makers during the relevant period, rather than the location of the entity with decision-making powers. The Granaders cite to *In re Suzanne de Lyon, Inc.,* 125 B.R. 863 (Bankr.S.D.N.Y. 1991), in which the court held that a company whose office was in Texas, but whose chief executive officer made most major business decisions while on business trips to New York, had its principal place of business in New York. The court there noted that its determination was based on facts peculiar to that case, however, including the fact that the CEO held all corporate management and control powers, and that the nature of the business (perfume marketed primarily overseas) required that the business be conducted in the environs of the international marketing and finance industries located in New York City. *Id.* at 867. The perfume was also manufactured in the New York City area, and the CEO supervised that production while in New York.

Here, by contrast, the case for looking to the location of individual decision-makers is

---

**12.** There is no indication in the record that Neal was absent from Chicago for any significant time during the relevant period.

far weaker. Although Weisel and Cozzi provided the hands-on management of Peachtree as an investment, decisions about the handling and disposition of the property were ultimately made by the Kemper Real Estate Investment Committee. Neither Weisel nor Cozzi was a member of the Committee. Thus, the authority to make decisions regarding Peachtree was considerably more diffused in this case than the situation in *Suzanne de Lyon,* and the argument for singling out Weisel and Cozzi's locations is thus weaker. Moreover, North Carolina, the location in which the Granaders theorize that Weisel [13] may have conducted some of the business of the Debtor, has no particular connection to the nature of Peachtree's business, unlike the New York City area which was a unique gathering of the resources and markets necessary to advance the business at issue in *Suzanne de Lyon.* North Carolina is simply where Weisel lived. There is nothing in the nature of the North Carolina environs that lends any support to the idea that Weisel conducted a substantial part of Peachtree's business there. For all of these reasons, we find that *Suzanne de Lyon*'s focus on the location of individual decision-makers on each day of the 180–day period does not control here.

Even assuming that the location of three individual Kemper employees during the 180–day period was a proper subject for discovery, the Granaders have shown no prejudice resulting from the denial of that discovery. If the Granaders had gotten the discovery they seek, what would it have shown? The travel expense receipts could show only the physical location of the employee at any given point in time, not whether the employee was conducting the business of the Debtor. Telephone records are equally unlikely to shed light on where major business decisions concerning the Debtor were reached, because all they revealed is the telephone number called. The record does not support any inference that Weisel ever telephoned the Debtor or its

property manager directly, so the records would not show calls to those parties' numbers, and telephone records of calls between North Carolina and the Kemper office in Chicago would provide no evidence at all about whether it was the Debtor's business or other business that was discussed. Moreover, Weisel himself testified at the venue hearing that he took telephone calls related to the Debtor's business while in North Carolina. 5/28/96 Tr. at 218. The Granaders could not have gotten any better evidence than this from the discovery they sought. As the Seventh Circuit has stated, "we will not reverse a decision to limit discovery 'absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant.'" *Gile,* 95 F.3d at 495 (citations omitted). The Granaders have made no such showing of prejudice here. The Bankruptcy Court did not abuse its discretion in denying the discovery at issue.

## II. THE ADVERSARY ACTION

In their appeal from the judgment in the adversary action, the Granaders raise several substantive points of error and also contend that the Bankruptcy Court lacked jurisdiction over the adversary action because the complaint in that action was deficient. We address this jurisdictional issue first.

### A. Sufficiency of the Adversary Complaint

The Granaders challenge the sufficiency of the adversary complaint on the grounds that it did not adequately allege a relationship between the easement dispute and the bankruptcy case such that the Bankruptcy Court could have jurisdiction over the easement dispute. Their logic is as follows: (1) Count I of the adversary complaint, which sought a permanent injunction requiring the removal of the parking spaces constructed by the Granaders in 1992, alleged in paragraphs 20 through 25 that the sale of the Peachtree apartment complex was dependent on a reso-

---

**13.** There is no indication in the record where Cozzi spent the two or three days a month that

he traveled outside the Northern District of Illinois.

lution of the easement dispute;[14] (2) the Debtor later stated in a document filed in the bankruptcy case that the litigation with the Granaders had no effect on the proposed reorganization Plan; (3) as a result of this statement and a motion to dismiss filed by the Granaders, the Bankruptcy Court struck paragraphs 20 to 25 of Count I from the complaint; and (4) the removal of these paragraphs also removed the Bankruptcy Court's subject matter jurisdiction over the easement dispute. The flaw in this ladder of logic is the fourth step. We do not agree that the adversary complaint failed to allege subject matter jurisdiction once paragraphs 20 to 25 had been struck.

Even without paragraphs 20 to 25, the complaint adequately alleged the relation of the easement dispute to the bankruptcy case, because the easement existed on land owned by the Debtor, and the dispute concerned the extent of the property interests held by each party under the easement. In this case, the determination of the easement dispute affected the nature and extent of the estate available for disposition in the bankruptcy case. This was the basis on which Judge Barliant properly declined to dismiss the complaint despite having struck certain portions of it. *See* 12/1/94 Tr. at 188–91.

■ Moreover, procedural developments effected by this court and the Bankruptcy Court mooted any jurisdictional defects that the complaint might have contained. On November 18, 1994, this court issued an order holding that the counterclaim filed by the Granaders in the adversary action was a proof of claim against the bankruptcy estate and that the adversary action was a core proceeding over which the Bankruptcy Court had proper jurisdiction. *Peachtree I,* 175 B.R. at 238. The Bankruptcy Court thereafter treated the Granaders as unsecured creditors. These rulings are dispositive of the issue of subject matter jurisdiction over the adversary action. *See* 28 U.S.C. § 157(b)(1) ("Bankruptcy judges may hear and determine ... all core proceedings arising under

title 11 "). The Granaders specify in their appellate brief that they are not appealing from those rulings here, nor are they asking us to reconsider them. Granaders' Cons.Appeal Br. at 4 n. 2. That being the case, we are frankly nonplussed by the Granaders' argument regarding the sufficiency of the complaint.

■ Even if the Debtor eventually stated that the resolution of the adversary proceeding was no longer strictly necessary to the administration of the bankruptcy estate (and the Debtor argues convincingly that its statement was taken out of context), it is well established that "when a case is within federal jurisdiction when filed, it remains there even if subsequent events eliminate the original basis for federal jurisdiction." *Chapman v. Currie Motors, Inc.,* 65 F.3d 78, 81 (7th Cir.1995); *see also Republic Nat'l Bank,* 506 U.S. 80, 88, 113 S.Ct. 554, 559, 121 L.Ed.2d 474 (1992) ("Stasis is not a general prerequisite to the maintenance of jurisdiction. "). Both because the complaint—even without paragraphs 20 to 25—properly alleged federal jurisdiction when it was filed, and because the Granaders themselves brought the adversary action within the Bankruptcy Court's jurisdiction by filing a counterclaim against the estate, jurisdiction in the Bankruptcy Court was initially proper. Even assuming *arguendo* that later events removed one of the Debtor's original bases for jurisdiction, the Bankruptcy Court did not err in retaining the case. We affirm the Bankruptcy Court's exercise of jurisdiction over the adversary action.

### B. Correctness of the Decision in the Adversary Action

The Granaders raise two substantive challenges to the Bankruptcy Court's judgment in favor of the Debtor in the adversary action. First, they contend that the Bankruptcy Court's interpretation of the easement was incorrect, and thus its injunction requiring the Granaders to remove the parking spaces and landscaped islands that extended

---

**14.** The other counts of the adversary complaint

did not include any allegations to this effect.

onto the Debtor's property should be reversed. The Granaders' second contention is that the Bankruptcy Court erred in rejecting their equitable defenses of laches, waiver and estoppel. As the Debtor's adversary complaint alleged trespass, a state law claim, and the Granaders' defenses likewise rely on Texas state law, we employ Texas law in our review.

### 1. Interpretation of the Easement

■ In its ruling in the adversary action, the Bankruptcy Court found that the Debtor was the owner in fee simple of the land on which the easement ran, known as Parcel A. Parcel A, which is about 40 feet wide, comprises a paved private road that leads from a street to the Peachtree apartment complex, and narrow strips of land on both sides of the road. A shopping center owns the land on either side of Parcel A. In 1982, the predecessors in interest to the current parties entered into the easement at issue. At the time the easement was executed, the shopping center had created 15 parking spaces that extended into Parcel A.

The Granaders acquired the shopping center in March, 1992. Beginning in September, 1992, the Granaders constructed landscaped islands and approximately 50 additional parking spaces that extended into Parcel A (" 1992 Improvements"). Shortly after the construction started, attorneys for the Debtor and the Granaders exchanged a series of letters and telephone calls, in which the Debtor threatened legal action to prevent the construction and the Granaders maintained that the easement permitted the construction of the additional spaces. The Granaders contend that they completed the construction after the Debtor's attorney assured their attorney that he would encourage the Debtor not to sue, while the Debtor's attorney flatly denies that he ever made this statement. The Debtor did not bring suit over the 1992 Improvements until the present bankruptcy case was filed in 1994. The Bankruptcy Court found as factual matters that the Debtor did not consent to the construction of the additional spaces, and that the Granaders had not relied upon any conduct of the Debt- or or its attorney in deciding to proceed with construction.

After examining the easement, the Bankruptcy Court held that the easement was restricted to the specific uses of ingress and egress and was not a general easement. The Bankruptcy Court also held that the extension of the shopping center's parking spaces into Parcel A was a continuing trespass, and that there was "a material difference between the 1992 Improvements and the improvements that existed on Debtor's Property [Parcel A] prior to the construction of the 1992 Improvements." Granaders' Cons.Appeal Br., Ex. 2 at 5. The court made no findings as to the proper width of the private roadway, or whether the 1992 Improvements interfered with the use of that roadway.

The Granaders contend that the Bankruptcy Court erred in interpreting the easement as a specific use easement for ingress and egress only. They note that in May, 1982, the town of Webster passed an ordinance requiring stores to have a certain minimum number of parking spaces, and that the shopping center had 15 parking spaces on Parcel A at the time the easement was executed on August 16, 1982. They reason from these facts that the parties to the easement must have intended the easement to permit parking by shopping center patrons.

■ The flaw in this argument is that it is not supported by any evidence, including the most important evidence—the language of the easement. "The scope of an express easement is determined by the same rules which are applicable to deeds and other instruments." *Phillips Pipe Line Co. v. Clear Creek Properties, Inc.,* 553 S.W.2d 389, 391 (Tex.Civ.App.1977, writ ref'd n.r.e.). The starting point for the construction of any instrument is its plain language. *See French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 797 (Tex.1995). The grant of easements is relatively brief, and states in pertinent part:

WHEREAS, NASA [the Debtor's predecessor in interest] and Wells Fargo [NASA's mortgage holder] ... desire to grant to the present and future owners,

lessees and mortgagees of all or any parts of Parcels "B" and "C" [the surrounding properties owned by the shopping center], ingress and egress easements over and along the driveway located, or to be located on Parcel A; and

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00) and other good and valuable consideration, ... NASA does hereby GRANT, SELL, AND CONVEY ... unto the present and future owner or owners, lessees and mortgagees of Parcels "B" and "C", an irrevocable easement for the perpetual non-exclusive right of ingress and egress for pedestrian and vehicular traffic over and along the driveway located, or to be located, within Parcel "A" ...

Granaders' Cons.Appeal Br., Ex. 7 (Grant of Easements) at 1.

The Granaders assert that the easement is ambiguous, but they do not identify any specific ambiguities and after reviewing the grant of easements we do not find any ambiguities relevant to the issues here. When a document is unambiguous, courts must look to the written terms of the document to determine the intent of the parties. *Bennett v. Tarrant Cty. Water Control & Improvement Dist. No. 1*, 894 S.W.2d 441, 446 (Tex. Civ.App.1995, writ denied) ("In construing a deed, the primary duty of a court is to ascertain the intent of the parties by a fundamental rule of construction known as the 'four corners' rule."); *Wall v. Lower Colorado River Auth.*, 536 S.W.2d 688, 691 (Tex.Civ. App.1976, writ ref'd n.r.e.) ("the instrument alone will be deemed to express the intention of the parties[,] for it is the objective, not the subjective, intent which controls"). "When the intent of the grantor is clear, as here, neither the trial court nor this court can ignore the rights created by the express grant." *Bennett*, 894 S.W.2d at 447.

Here, the express language of the easement identifies it as an easement limited to the specific uses of ingress and egress. *Compare Coleman v. Forister*, 514 S.W.2d 899, 903 (Tex.1974) (where the grant of easements expressly provides the right of ingress and egress, and "[n]o mention is made of any other rights of user,.. none may be implied"); *Phillips Pipe Line Co.*, 553 S.W.2d at 392 (the "right of ingress and egress" usually refers only to the right to enter and exit; where the terms of the easement gave the pipeline company the right of ingress and egress to a 20–foot wide strip of land on which their pipeline was located, no other use of the land outside of the 20–foot strip was permitted); *Wall*, 536 S.W.2d at 690–91 (where grantees were given "the right of ingress and egress," that was the only right conveyed by the easement and no implied easement for other uses existed).

■ The Granaders argue that the presence of the 15 parking spaces (which did not extend into the private roadway) indicates that uses other than ingress and egress were to be permitted, at least as to the non-driveway portion of Parcel A. As indicated above, however, under Texas law courts must determine the objective intent of the parties as expressed in the document itself, rather than their subjective intent suggested by evidence outside the document. Nothing in the Grant of Easements suggests that parking on the non-driveway portion of Parcel A is permitted (or even contemplated). Indeed, the non-driveway portion of Parcel A is not even mentioned in the easement, except possibly in a provision referring to "curb cuts" which undisputedly does not apply here. The express language of the easement grants a "perpetual non-exclusive right of ingress and egress" only "over and along the driveway."

The Granaders themselves agree that "the right of ingress and egress is restricted to that limited portion" of Parcel A that is "over and along the driveway." Granaders' Cons.Appeal Br. at 70. The Granaders argue, however, that the Grant of Easements pertains to all of Parcel A, and that the absence of any mention of the uses to which the non-driveway portion may be put means that they have been granted an easement to do whatever they like there, including parking cars. This interpretation of the Grant of

Easements is not in accord with either the language of the Grant or the case law on the construction of written instruments. There is no indication in the Grant that an easement is granted over all of Parcel A. Rather, the only language identifying the property over which an easement is granted speaks of "the driveway located, or to be located, on Parcel A." As noted above, in construing any document courts must begin with the plain language of the document itself. The most straightforward interpretation of the Grant is that the easement pertains only to the driveway portion of Parcel A, and does not include the portions of Parcel A that lie on either side of the present paved private road. Reading the document as a whole, there is simply no indication that the parties reached any agreement as to the use by the grantee of the land outside of the "driveway."[15] There certainly is no indication that the parties intended to permit parking, as opposed to ingress and egress, over these non-driveway portions.

The Granaders argue that under Texas law, they are entitled to make use of the easement property in any manner that is not "inconsistent with or repugnant to" the Grant of Easements, citing *City Public Service Board v. Karp*, 585 S.W.2d 838, 841 (Tex.Civ. App.1979, no writ). This argument has no force here, where we have concluded that the only easement property is the private roadway. *Karp* is also distinguishable on its facts. The use sought by the grantee there was for an above-ground electric transformer, which was well within the scope of the grant of easement, which was granted for the specific purpose of permitting an electric transformer. *Id.* By contrast, the use the Granaders seek to make of Parcel A is well

beyond the scope of the Grant of Easements here, which permits only ingress and egress along a driveway. Thus, the Granaders' reliance on *Karp* is misplaced. In addition, while "[a] grant or reservation of an easement in general terms implies a grant of unlimited reasonable use such as is reasonable necessary and convenient and as little burdensome as possible to the servient owner," grantees "are entitled to the rights granted by the instrument, and no more." *Coleman*, 514 S.W.2d at 903. As the Texas supreme court held in *Coleman*, where ingress and egress are the only uses specified by a grant of easements, no "other rights of user ... may be implied." *Id.*

The Granaders' citation to *Baer v. Dallas Theater Center*, 330 S.W.2d 214 (Tex.Civ. App.1959, writ ref'd n.r.e.) is similarly fruitless. The easement at issue in *Baer* was granted in connection with a charitable donation of land to build a theater or school of drama. Although the easement stated that the easement property was to be used "as a private road for pedestrian and vehicular traffic," nothing in the easement provided that ingress and egress were the sole uses envisioned. In light of all these facts, the court concluded that the easement was not limited to ingress and egress, and that the right to park vehicles was intended by the parties to the easement. *Id.* at 218–19. *Baer* is inapplicable here, where the easement expressly grants only the rights of ingress and egress.

■ Lacking any grant of easement other than for ingress and egress upon the driveway, the Granaders are without any justification for the trespass created by the parking spaces and landscaping that en-

---

**15.** Among their other arguments, the Granaders contend that the Bankruptcy Court's failure to define the terms "driveway," "private road," and "roadway" used in the easement, or to make a factual finding regarding the width of the road, renders its judgment deficient. This argument has no merit. First, such definitions and findings were unnecessary to the Bankruptcy Court's determination. The required and actual widths of the road in particular are irrelevant. Second, any thoughtful reading of the easement as a

whole clearly discloses the intention of the parties that all of the phrases refer to the same thing—the paved private road that NASA agreed to (and apparently did) construct upon Parcel A. *See id.* at numbered par. 2. *See also Mullins v. Elieson*, 611 S.W.2d 921, 925 (Tex.Civ.App.1981, no writ) (general rule that the words and phrases used in a document will be given their ordinary and commonly accepted meaning, absent any indication to the contrary).

croach upon the non-driveway areas. The Granaders have abandoned on appeal their argument that NASA acquiesced to the parking spaces, but even if they had not it is clear that under Texas law mere acquiescence to non-conforming uses cannot vary the terms of an express easement. *See Wall*, 536 S.W.2d at 691–92 (where the meaning of the easement was plain and unambiguous, the grantee's non-conforming use over 15 years and the grantor's acquiescence in that use were legally irrelevant) (citing *Highland Farms Corp. v. Fidelity Trust Co.*, 125 Tex. 474, 82 S.W.2d 627, 631 (Comm'n App.1935)). While the original grantor of the easement may have decided to permit shopping center patrons to park 15 cars in a manner that encroached upon Parcel A, that long-ago informal decision cannot change the extent of the actual grant of easement. Moreover, the Bankruptcy Court found that the 1992 Improvements substantially changed the nature and extent of the trespass, a finding not disputed by the Granaders on appeal. Thus, acquiescence to the 1982 parking spaces would not indicate an intent to permit the 1992 Improvements. We find ample support in both Texas law and the record for the Bankruptcy Court's rulings regarding the scope of the grant of easements.

### 2. Equitable Defenses

The Granaders lastly contend that the Bankruptcy Court erred in rejecting three of the equitable defenses they raised: estoppel, laches, and waiver. Although these three defenses occasionally have been applied interchangeably in Texas cases, they are different defenses that each have their own required elements. *Campbell v. Pirtle*, 790 S.W.2d 372, 374 (Tex.App.1990, no writ). A common theme underlies the Granaders' raising of all these defenses—that the Debtor's delay in suing the Granaders over the 1992 Improvements until almost two years later prejudiced them, and should bar. the Debtor's action. Because we find no support for this premise, we reject all of their defenses and affirm the decision of the Bankruptcy Court.

*Estoppel*

The Granaders' claim of estoppel, like their other equitable defenses, arises from the fact that after initially threatening suit over the 1992 Improvements, the Debtor took no legal action until it filed for bankruptcy in 1994. Their implication is that it was this delay in bringing suit that caused them to proceed with the 1992 Improvements, and that they would not have spent $100,000 on those improvements had they known the extent of the Debtor's opposition. The main support for this argument is clever language in the appellant's briefs, however. The Debtor's attorney who dealt with the Granaders testified that he never stated that the Debtor's opposition to the 1992 Improvements had vanished, nor did he encourage them to proceed with the Improvements. The Bankruptcy Court found that, in constructing the 1992 Improvements, the Granaders were acting on their own mistaken belief that the Grant of Easements permitted the construction, and did not rely on any statement or act of the Debtor, nor on any failure by the Debtor to speak or act. The Granaders have not challenged this finding; instead, they argue that it is irrelevant to their equitable defenses. The Granaders are wrong.

Under Texas law, equitable estoppel has two essential elements: intentional conduct by one party, and detrimental reliance on that conduct by the other party. *See Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co., Inc.*, 416 S.W.2d 396, 401 (Tex. 1967) ("estoppel arises where by fault of one, another has been induced to change his position for the worse") (quoting *Wirtz v. Sovereign Camp, W.O.W.*, 114 Tex. 471, 268 S.W. 438, 441 (1925)); *Miller v. Sandvick*, 921 S.W.2d 517, 524 (Tex.App.1996, writ denied) (estoppel prevents one party from disavowing "conduct which induced another to act detrimentally in reliance upon it"); *Campbell*, 790 S.W.2d at 374 (same). Here, neither element of estoppel is present. The Debtor engaged in no intentional conduct designed to mislead the Granaders, and (as the trial court found) the Granaders did not

rely upon the Debtor's conduct in deciding to proceed with construction.

■ The gist of the Granaders' argument is that the Debtor's silence while they completed the 1992 Improvements should prevent its ultimate suit, but Texas courts find estoppel by silence only in rare instances, where there is either a duty to speak or other misconduct by the one to be estopped. *See Self v. Kinder,* 474 S.W.2d 632, 634–35 (Tex.Civ.App.1971, writ ref'd n.r.e.) (estoppel by silence arises only where circumstances impose a duty to speak); *Terrell Hills Baptist Church v. Pawel,* 286 S.W.2d 204, 208 (Tex.Civ.App.1956, no writ) (estoppel by silence or inaction is only available where there is "some element of turpitude or negligence connected with the silence or inaction by which the other party is misled to his injury") (internal quotations omitted). Nothing in the record would support a finding that the Debtor was under a duty to speak, or that the Debtor intended its inaction and silence to be relied upon by the Granaders. Absent such evidence, no estoppel by silence can exist.

The Granaders' reliance on the case of *Barksdale v. Allison,* 210 S.W.2d 616 (Tex. Civ.App.1948, no writ)[16] to support its estoppel defense is misplaced. In that case, the court denied Barksdale an injunction to stop the construction of a mostly completed commercial building on the grounds of estoppel and laches. The evidence showed that Allison had asked Barksdale, who lived across from the site, how the neighbors felt about the proposed building; Barksdale had answered that Allison should go before the zoning board and apply for a permit, and then he would know whether he could construct the building or not; and Barksdale

had never indicated any opposition to the project or intent to sue. *Id.* at 617. This evidence is clearly susceptible to a finding of reasonable reliance, and we believe that this interpretation was instrumental to the court's finding of estoppel and laches although the court did not expressly mention reliance. *Barksdale* is thus inapplicable to this case, in which there is an unchallenged finding that there was no reliance. The Bankruptcy Court was right to reject the Granaders' estoppel defense.

*Laches*

■ It is undisputed that the Debtor brought its trespass claim against the Granaders within two years, the limitations period for trespass actions in Texas. The Granaders argue that the Debtor's action is barred by laches, however. They claim that during the nearly two years that passed between the Debtor's threat to sue over the 1992 Improvements and the time that it actually did so, they changed positions to their detriment.

■ The Texas supreme court has stated that the defense of laches may be available, even when the statute of limitations has not run, in extraordinary cases in which "deny[ing] a defendant the defense of laches would work a grave injustice." *Culver v. Pickens,* 142 Tex. 87, 176 S.W.2d 167, 170 (1943). Laches may apply "when one unreasonably delays in asserting his rights against another who in good faith has changed his position to his detriment because of the delay." *Campbell v. Pirtle,* 790 S.W.2d 372, 375 (Tex.App.1990, no writ). As a preliminary matter, we do not believe that the delay that occurred here can be said to be unreasonable as a matter of law. Texas courts have stated that "the law does not demand

---

**16.** In their appellate brief, the Granaders state that "[a]t the time the Bankruptcy Court ruled, *Barksdale v. Allison* was an obscure, nearly half-century old decision. Yet on April 30, 1996—after the Bankruptcy Court's ruling—the Texas Appellate Court reaffirmed the validity of the holding in *Barksdale v. Allison.*" Granaders' Cons.Appeal Br. at 66 (citing *Miller v. Sandvick,* 921 S.W.2d 517 (Tex.App.1996, writ denied)). To the extent that this statement attempts to

paint *Miller* as a dramatic new citation approving *Barksdale,* it is a misrepresentation of the first water. In reality, *Barksdale* has been cited regularly in the years since it was issued, although it has often been distinguished from the cases citing it—just as *Miller* distinguished it. This bit of breathless overexaggeration is typical of the glosses the Granaders have attempted to place on the facts and law of these related cases throughout their appeal.

the utmost exertion of diligence in repelling a hostile invasion of one's rights deliberately undertaken with full knowledge of all the facts." *Terrell Hills Baptist Church*, 286 S.W.2d at 209 (quoting *Arrington v. Cleveland*, 242 S.W.2d 400, 403 (Tex.Civ.App.1951, writ ref'd n.r.e.)); *see also Lee v. Powers*, 446 S.W.2d 938, 940 (Tex.Civ.App.1969, no writ). The Granaders' decision to proceed with the 1992 Improvements falls into this category, and thus the Debtor was not required to assert its rights without delay. Even if the delay were unreasonable, however, we do not find that this is the type of extraordinary case in which the defense of laches is warranted, because it is uncontroverted that the Debtor's delay was not the cause of the Granaders' detriment. Rather, the Bankruptcy Court clearly found that the sole basis for the Granaders' decision to proceed with the 1992 Improvements was their own belief that the easement permitted the Improvements.

As noted above, the Granaders have not challenged this finding. Instead, they once again rely heavily on *Barksdale v. Allison*. Just as in the estoppel context, *Barksdale* is distinguishable in the laches context because the evidence there indicated that Barksdale's statements and inaction were the cause of Allison's good faith change in position (i.e., commencing construction). Because there is no similar causal connection here, no defense of laches exists.

*Waiver*

Waiver is "the intentional relinquishment of a known right" or intentional conduct that is inconsistent with asserting that right. *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co., Inc.*, 416 S.W.2d 396, 401 (Tex.1967); *see also Terrell Hills Baptist Church*, 286 S.W.2d at 208. The Granaders are alleging the second type of waiver here, contending that the Debtor implicitly waived its right to sue them over the 1992 Improvements by waiting to do so. Waiver is unilateral in character, unlike laches or estoppel, as one party acting alone who abandons his rights is sufficient to create waiver. *Campbell*, 790 S.W.2d at 375.

After hearing and considering all of the evidence adduced at trial, the Bankruptcy Court found no evidence that the Debtor intended to waive its right to sue the Granaders. On appeal, the Granaders have not challenged this finding, but instead argue that the Bankruptcy Court misapprehended the legal requirements of waiver. We have reviewed the entire record related to the Bankruptcy Court's rejection of the waiver defense and find no error. Nothing in the record suggests that the Debtor intended to permanently relinquish its right to sue over the 1992 Improvements, nor is its delay in suing inconsistent with an intent to preserve its rights. The Bankruptcy Court's denial of the defense of waiver was not error. We agree with the Bankruptcy Court's rejection of all of the Granaders' equitable defenses, and therefore affirm the judgment in favor of the Debtor in the adversary action.

## CONCLUSION

The Bankruptcy Court's rulings in the bankruptcy case of *In re Peachtree Lane Assocs., Ltd.*, No. 94 B 14909, and the Bankruptcy Court's judgment for the Debtor in the adversary action *Granader v. Peachtree Lane Assocs., Ltd.*, No. 94 A 01468, are affirmed.